126 P.3d 1071

Wayne LESLIE, Appellant/Appellant–Appellee

v.

BOARD OF APPEALS OF the COUNTY OF HAWAI'I; Evarts Fox in his capacity as Chairperson of the Board of Appeals of the County of Hawai'i; Christopher Yuen in his capacity as Planning Director of the County of Hawai'i, Appellees/Appellees–Appellants

Ki'ilae Estates, LLC, Applicant/Appellee/Appellee–Appellee

and

Protect Keopuka 'Ohana; Jim Medeiros; Jack Kelly, Appellees/Appellees–Appellees.

No. 26184.

Supreme Court of Hawai'i.

Jan. 25, 2006.

As Amended Feb. 28, 2006.

Bobby Jean Leithhead–Todd and Patricia K. O'Toole, Deputies Corporation Counsel, County of Hawai'i, on the briefs, for Appellants Board of Appeals of the County of Hawai'i, Evarts Fox, and Christopher Yuen.

Michael W. Moore, Hilo, and R. Ben Tsukazaki (Tsukazaki Yeh & Moore), on the briefs, for Appellee Ki'ilae Estates, LLC.

David Kimo Frankel (Legal Aid Society of Hawai'i), on the briefs, for Appellee Wayne Leslie.

Robert H. Thomas, Honolulu, (Damon Key Leong Kupchak Hastert), on the briefs, for Amicus Curiae Pacific Legal Foundation.

MOON, C.J, LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We affirm the September 25, 2003 final judgment of the circuit court of the third circuit (the court)[1] in favor of Appellant/Appellant–Appellee Wayne Leslie (Appellee) and against Appellees/Appellees–Appellants Board of Appeals of the County of Hawai'i (the Board), Evarts Fox (Fox), in his capacity as Chairperson of the Board of Appeals of the County of Hawai'i, Christopher Yuen (the Director), in his capacity as Planning Director of the County of Hawai'i [collectively, Board Appellants], and Applicant/Appellee/Appellee–Appellee Ki'ilae Estates, LLC (KEL), Appellants/Appellees–Appellees Protect Keopuka 'Ohana (PKO), Jim Medeiros (Medeiros), and Jack Kelly (Kelly) [collectively, KEL Appellees].

I.

Appellee is a native Hawaiian fisherman and practitioner of Hawaiian medicine residing in Napo'opo'o, Hawai'i County, Hawai'i. He engages in customary and traditional Ha-

---

1. The Honorable Ronald Ibarra presided.

waiian practices on property located south of Puʻuhonua o Honaunau National Historic Park (the Park), identified as TMK: 8–5–005:019. He fishes offshore from the ahupuaʻa[2] of Kauleoli. Appellant also gathers pilo[3] and uha loa[4] for medicinal purposes from the ahupuaʻa of Kauleoli and fishes and picks opihi,[5] limu,[6] and aʻama[7] from the Kauleoli shoreline.

In April of 2000, KEL obtained an interest in approximately 803 acres of land including the subject property of the instant case in the ahupuaʻa of Kauleoli and land situated north in the ahupuaʻa of Kiʻilae. The Park is situated north of Kiʻilae along the shoreline. Some time prior to KEL's acquisition of this property, the National Park Service (the NPS) had expressed an interest in expanding the Park. The NPS hoped to acquire approximately 30 acres of land within Kiʻilae, which is an area in the special management area along the shoreline.

KEL submitted an application for a subdivision covering 739 acres of the property it had acquired. It also had an "archeological reconnaissance survey" (the survey) conducted of the entire 803 acres of land. The survey showed that the mauka[8] portion of Kiʻilae contained well-preserved archeological features. The NPS then became interested in acquiring approximately 238 acres of the Kiʻilae ahupuaʻa. The 238 acres of land within the Kiʻilae ahupuaʻa was then sold to the Trust for Public Lands, which was to resell the land to the NPS for expansion of the Park.

On October 23, 2001, KEL submitted an application to the County of Hawaiʻi Planning Department for approval of a subdivision of approximately 457 acres within the ahupuaʻa of Kauleoli into 55 lots. The 55 lots were to be comprised of "40 lots of approximately 5 acres each, 3 lots of approximately 8 acres each, 4 lots of approximately 17 acres each, one 74–acre lot, one 64–acre lot, a remainder lot of 96 acres, and 5 roadway lots." This property is bordered on the mauka side by the Mamalahoa Highway and extends to the shoreline. It is zoned by the County of Hawaiʻi as "Agriculture 5 acres" (A–5a), meaning that the minimum permitted size of lots is 5 acres.

By letter dated January 9, 2002, the Director granted tentative approval of the subdivision. On January 10, 2002, Appellee sent a letter to the Director informing him that Appellee engaged in customary and traditional practices on and near the subject property. On February 7, 2002, the Director's decision was appealed to the Board by Appellee PKO, Medeiros, and Kelly. By stipulation of the parties, the Board appointed Colin L. Love, Esq. (Love) to serve as the Hearing Officer.

On October 8, 14, 15, and 22, contested case hearings were held. On January 13, 2003, Love submitted his proposed "Findings of Fact, Conclusions of Law, and Recommendation of the Contested Case Hearing Officer" to the Board, recommending that it affirm the Director's issuance of the tentative subdivision approval.

On February 14, 2003, the Board held a hearing and voted to affirm the tentative subdivision approval. The Board issued its

---

2. "Ahupuaʻa" is a "land division usually extending from the uplands to the sea, so called because the boundary was marked by a heap of stones surmounted by an image of a pig, or because a pig or other tribute was laid on the alter as tax to the chief." M. Pukui & S. Elbert, *Hawaiian Dictionary* 9 (rev. ed.1986) [hereinafter, *Hawaiian Dictionary* ].

3. "Pilo" is defined as "some species of native shrubs." *Hawaiian Dictionary* at 331.

4. "Uha Loa" is "a small, downy American weed, with ovate leaves and small, clustered yellow flowers." *Hawaiian Dictionary* at 363.

5. "Opihi" are defined as "limpets." *Hawaiian Dictionary* at 292.

6. "Limu" is "a general name for all kinds of plants living under water, both fresh and salt, also algae growing in any damp place in the air, as on the ground, on rocks, and on other plants; also mosses, liverworts, lichens." *Hawaiian Dictionary* at 207.

7. "Aʻama" is "a large, black, edible crab that runs over shore rocks." *Hawaiian Dictionary* at 3.

8. "Mauka" is defined as "inland." *Hawaiian Dictionary* at 242.

"Findings of Fact, Conclusions of Law, Decision and Approval" on March 5, 2003.

On March 14, 2003, Appellee appealed the Board's decision to the court. The court heard oral argument on September 8, 2003. On September 24, 2003, the court issued its "Findings of Fact; Conclusions of Law; and Order Granting the Appeal." On October 6, the Board and the Director filed a "Motion to Seek Clarification and/or to Alter or Amend Findings of Fact, Conclusions of Law, and Order Granting the Appeal, Filed September 24, 2003."

The court granted the motion and issued an "Amended Findings of Fact; Conclusions of Law; and Order Granting the Appeal" (the order) on November 12, 2003. In relevant part the order stated:

This matter, having come before the Court for oral argument on September 8, 2003, pursuant to Appellant's Notice of Appeal filed March 14, 2003, with Appellant Wayne Leslie[,] ... Appellant [sic] Ki'ilae Estates, LLC ..., and the County of Hawai'i. The court, ... having heard the arguments of counsel and having reviewed the record and file of the case, find as follows:

### FINDINGS OF FACT

If it should be determined that any of these Findings of Fact should have been set forth as Conclusion[s] of Law, then they shall be deemed as such.

. . . .

2. TMK 8–5–05:19 is identified as an example of natural beauty in the General Plan. ROA: F# 3 p.2048–49 and ROA: F# 5 p. 2660.

. . . .

4. *A portion of the subject land area is located within the special management area.* FOF No. 47, ROA p. 2941.

. . . .

7. The Board of Appeals Decision upheld the Planning Director, Christopher Yuen's tentative subdivision approval dated January 9, 2002, of Ki'ilae Estates LLC's proposed subdivision. *Id.*

8. *The preliminary plat did not include: a drainage study (ROA: F# 4, p. 2601, FOF 63); information on areas subject to inundation or storm water overflow (Id. and FOA: F# 1 p. 141); information on the existing uses of the property (ROA: F# 4 p. 2592–93 FOF 13–15, ROA: F# 4, p. 2602, FOF 73); information on the water system to be installed (ROA: F# 4, p. 2602, FOF 73); information regarding provisions for sewage/wastewater disposal (ROA: F# 4, p. 2602, FOF 75 and ROA: F# 1 p. 150); information regarding provisions for drainage or flood control (ROA: F# 4 p. 2602 FOF 75); information on the existence of water mains and electric lines near the property (ROA: F# 4 p. 2602 FOFs 70 and 71); information on improvements to be made by the developer (ROA: F# 5 pp. 2680–81); all the proposed deed restrictions (ROA: FOF # 5 pp. 2642, 2732–34, 2760, F# 6 pp. 2977–79); all the proposed easements (ROA: F# 5 pp. 2642, 2751–52 and ROA: F# 2 p. 485); and information on land proposed to be dedicated to public use (ROA: F# 5 pp. 2644, 2740, 2750–51, 2761, 2766–67, F# 6 p. 295 and F# 2 p. 484).*

9. The Planning Director did not make any specific inquiry into the current exercise of traditional native Hawaiian gathering rights on the proposed subdivision property prior to tentative subdivision approval. (ROA: FOF# 4 pp. 2592–93, FOF 17).

10. The Planning Director did not consider the objectives and policies of [Hawai'i Revised Statutes (HRS) § ] 205A–2 prior to approval. ROA: F# 5 p. 2658.

11. The Planning Director acknowledged that the Ki'ilae Estates Subdivision "may adversely affect coastal resources." FOA: F# 5 p. 2654.

12. The Planning Director did not analyze the visual impacts of the project

prior to approval. ROA F# 5, p. 2659.

## CONCLUSIONS OF LAW

If it should be determined that any of these Conclusions of Law should have been set forth as Findings of Fact, then they shall be deemed as such.

### Standard of Review

1. Pursuant to [HRS] § 91–14(g), in an appeal from an agency decision the Court may, upon review of the record, affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, or orders are:

   (1) In violation of constitutional or statutory provisions; or

   . . . .

   (3) Made upon unlawful procedure; or

   (4) Affected by other error of law . . . *HRS § 91–14(g).*

### Mandatory Requirements of Hawai'i County Code for Subdivision Approval

2. Where the language of a statute is plain and unambiguous, and a specific requirement must be met, it is mandatory and not merely directory. *Town v. Land Use Commission,* 55 Haw. 538, 543, 524 P.2d 84 (1974).

3. *Hawai'i County Code, Chapter 23 (Subdivision Control Code), §§ 23–63, 23–64, 23–65 and 23–66 are unambiguous regarding the information that is required to be submitted with a preliminary plat which is submitted with an application for subdivision approval.*

4. The Subdivision Control Code requires, among other information, the following information to be included in a preliminary plat:

   (1) The location of and direction of all water courses and approximate location of or areas subject to inundation or storm water overflow; HCC § 23–64(3);

   (2) Existing uses of property, including but not limited to, location of all existing structures, wells, cisterns, private sewage disposal systems, and utilities; HCC § 23–64(4);

   (3) Existing and proposed easements, showing width and purpose; HCC § 23–65(2);

   (4) Proposed deed restrictions in outline form if any; HCC § 23–66(2);

   (5) The approximate location within the subdivision and in the adjoining streets and property of existing sewers and water mains, culverts and drain pipes, electric conduits or lines proposed to be used on the property to be subdivided and invert elevations of sewers at points of proposed connections; HCC § 23–66(3);

   (6) Statement regarding water system to be installed, including source, quality and quantity of water; HCC § 23–66(4);

   (7) Provisions for sewage disposal, drainage and flood control which are proposed. The drainage map shall include the approximate location of areas subject to inundation or storm water overflow and all areas covered by waterways, including ditches, gullies, streams and drainage courses within or abutting the subdivision; HCC § 23–66(5);

   (8) Parcels of land proposed to be dedicated to public use, and the conditions of such dedication; HCC § 23–66(6);

   (9) Improvements to be made by the developer and the approximate time such improvements are to be completed. HCC § 23–66(7).

5. *The Planning Director did not comply with the mandatory informational requirements of HCC §§ 23–63, 23–64, 23–65, and 23–66 when granting tentative approval to Ki'ilae Estates, LLC's subdivision application.*

### Compliance with County General Plan, State Law, and County Regulations

6. Section 23–23 of the Haw. County Code, Chap. 23 states that:

   Subdivisions shall conform to the County general plan and shall take into consideration preliminary plans made in antici-

pation thereof. Subdivisions shall conform to the requirements of State law, County department of public works, State department of health, State department of transportation, and County department of water supply requirements and the standards established by this chapter. HCC § 23–23.

7. Section 23–23, is unambiguous regarding the fact that Subdivision must comply with the County general plan, State law, and County requirements, as well as the Subdivision Control Code.

8. Section 23–73 of the Haw. County Code states that the final plat shall be "substantially similar" to the approved preliminary plat. "Sufficient detail regarding proposed improvements shall be submitted so that they may be checked for compliance with objectives of these regulations, State laws, and other applicable County ordinances." HCC § 23–66(7).

9. Section 23–73, read together with the rest of Section 23, mandates that Section 23–23 applies to preliminary plats submitted for tentative approval.

**Special Management Area Permit**

10. *No development shall be allowed in any county within the special management area without obtaining a special management area permit.* HRS § 205A–28; County of Hawai'i Planning Commission Rule 9–8; *Hawai'i's Thousand Friends v. City & County,* 75 Haw. 237, 240, 858 P.2d 726 (1993).

11. The first step in determining whether a special management area use permit is required for a particular development, is to ascertain whether the activity is included in the definition of "development" in Haw. Rev. Statutes § 205A–22. *If the activity fall [sic] within one of the five categories of activities described in this definition, then the analysis proceeds to the next step. Ki'ilae Estates LLC is planning a subdivision, a portion of which lies in the special management area. Subdivisions are included in*

*the definition of "development" under HRS § 205A–22(3).*

12. Having found that the proposed subdivision is a development, *the next step is to determine whether the activity is excluded pursuant to any of the fifteen categories of excluded activities.* HRS § 205A–22. *Subdivision of land into lots greater than twenty acres in size is an excluded use.* HRS § 205A–22(11). *That portion of the proposed Ki'ilae Estates subdivision that is located within the Special Management Area is larger than 20 acres,* thus it [is] an excluded use.

13. The third step is to determine whether, *even if an activity is excluded, the activity "is or may become part of a larger project, the cumulative impact of which may have a significant adverse environmental or ecological effect on the Special Management Area, that activity shall be defined as 'development' " and an SMA permit will be required.* County of Hawai'i Planning Common Rules of Practice and Procedure, Rule 9–4(10)D.

14. The Planning Director has already concluded that the Ki'ilae Estates proposed subdivision "may adversely affect coastal resources." FOA: F# 5 p. 2654.

15. The law requires an inquiry as to whether an overall project *may* have a significant environmental impact. *Hawai'i's Thousand Friends,* 75 Haw. at 249, 858 P.2d 726 (emphasis in original).

16. Under *Hawai'i's Thousand Friends,* 75 Haw. at 246–47, 858 P.2d 726, the "possible cumulative impacts" of the whole project, not just the parcel located in the special management area, must be taken into consideration when assessing the environmental or ecological effect on the special management area. *If the project "may have a significant environmental or ecological effect on the special management area," then the project "shall*

*be defined as 'development' and will require a SMA use permit." Id.*

17. The Planning Director should have required Ki'ilae Estates, LLC, to apply for a SMA use permit and adhere to the SMA permitting process detailed in HRS chapter 205A and County of Hawai'i Planning Common Rules of Practice and Procedure, Rule 9–11.

## ORDER

IT IS HEREBY ORDERED that the Appeal is Granted;

IT IS FURTHER ORDERED that the decision of the Board of Appeals is reversed;

*IT IS FURTHER ORDERED that this case is remanded to the Planning Department with instructions to the Planning Director to ensure that the preliminary plat and subdivision application comply with HCC §§ 23–23, 23–63, 23–64, 23–65, and 23–66, and the remainder of the Subdivision Control Code prior to granting tentative approval for Ki'ilae Estates LLC's proposed subdivision.*

*IT IS FURTHER ORDERED that the Planning Director shall require Ki'ilae Estate, LLC to apply for and obtain a SMA use permit prior to granting tentative approval for Ki'ilae Estates LLC's proposed subdivision.*

(Emphases added and in original.) The "Subdivision Control Code," as referred to by the court, is Chapter 23 of the Hawai'i County Code, hereinafter referred to as "the Code." On December 12, 2003, the Board Appellants filed their Notice of Appeal to this court.

## II.

On appeal, the Board Appellants and the KEL Appellees argue that the court erred in (1) concluding that the provisions of the Code, Chapter 23, Article 4, stating that certain information "shall" be submitted with preliminary plat plans are mandatory, rather than directory, and that the Planning Director lacks discretion in implementing the Code because (a) the word "shall" can be interpreted as directory under certain circumstances according to *Perry v. Planning Comm'n,* 62 Haw. 666, 619 P.2d 95 (1980) and *Jack Endo Elec. v. Lear Siegler, Inc.,* 59 Haw. 612, 585 P.2d 1265 (1978), and (b) requiring strict compliance with the Code would produce an absurd and unjust result, and (2) concluding that a Special Management Area (SMA) Use Permit is required before the Planning Director can issue tentative subdivision approval. In conjunction with their first issue on appeal, the Board Appellants and the Ki'ilae Appellees assert that the court erred in conclusions of law 2, 3, and 5. In conjunction with their second issue on appeal, the Board Appellants and the Ki'ilae Appellees assert that the court erred in conclusions of law 11, 12, 13, 14, 15, 16, and 17.

In response, Appellee argues that (1) "the informational requirements of the [Code] are mandatory," (2) a SMA use permit was required because (a) Ki'ilae Estates is subdividing land within the SMA, (b) the project "will change the intensity of use of the water, the ecology of the water, or access to it within the SMA," and (c) the subdivision will have significant cumulative impacts, and (3) the court's decision may be affirmed on other grounds including that (a) Native Hawaiian rights were not investigated or protected, (b) the General Plan was ignored, (c) the requirements of the public trust doctrine were disregarded, and (d) the Board's decision was not supported by substantial evidence.

Neither the Board Appellants nor the Ki'ilae Appellees submitted a reply brief. They request that this court reverse the final judgment of the court and affirm the decision of the Board.

An amicus brief was submitted by the Pacific Legal Foundation (PLF) in support of the arguments of the Board Appellants and the KEL Appellees. PLF presents only the following question: "When a property owner proposes no use within the SMA, does the Coastal Zone Management Act, [HRS] ch. 205A ([Supp.] 2001 & Supp.2003) (CZMA) nonetheless require the owner obtain a SMA Use Permit prior to subdividing the non-SMA portion of its property?" PFL re-

quests that this court reverse the court's final judgment in favor of Appellee.

## III.

■ " 'Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision.' " *Lanai Co., Inc. v. Land Use Comm'n,* 105 Hawai'i 296, 306–07, 97 P.3d 372, 382–83 (2004) (quoting *Soderlund v. Admin. Dir. of the Courts,* 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001)).

To determine if the decision under review is right or wrong, we "apply the standards set forth in HRS § 91–14(g) to the agency's decision." *Ka Pa'akai O Ka'aina v. Land Use Comm'n,* 94 Hawai'i 31, 40, 7 P.3d 1068, 1077 (2000). HRS § 91–14(g) (2003) provides that:

> Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1) In violation of constitutional or statutory provision; or
>
> (2) In excess of the statutory authority or jurisdiction of the agency; or
>
> (3) Made upon unlawful procedure; or
>
> (4) Affected by other error of law; or
>
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

■■ "It is well settled 'that in an appeal from a circuit court's review of an administrative decision the appellate court will utilize identical standards applied by the circuit court. The clearly erroneous standard governs an agency's findings of fact[.]' " *Lanai Co.,* 105 Hawai'i at 307, 97 P.3d at 383 (quoting *Dole Hawaii Division–Castle & Cooke, Inc. v. Ramil,* 71 Haw. 419, 424, 794 P.2d

1115, 1118 (1990)). " 'An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.' " *Poe v. Hawai'i Labor Relations Bd.,* 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004) (quoting *Kilauea Neighborhood Ass'n v. Land Use Comm'n,* 7 Haw. App. 227, 229–30, 751 P.2d 1031, 1034 (1988)).

■ "[T]he courts may freely review an agency's conclusions of law.' " *Lanai Co., Inc. v. Land Use Comm'n,* 105 Hawai'i at 307, 97 P.3d at 383 (quoting *Dole Hawaii Division–Castle & Cooke, Inc.,* 71 Haw. at 424, 794 P.2d at 1118).

## IV.

### A.

As stated *supra,* in conjunction with their first point on appeal, the Board Appellants and the KEL Appellees argue that (1) the word "shall" may be construed as directory, rather than mandatory in certain circumstances and (2) requiring compliance with the Code would produce an absurd and unjust result. The Board posits the additional argument that customary and traditional practices have been considered and protected in the proposed subdivision. KEL further asserts that the Board's interpretation of the Code should be given deference.

### B.

The relevant provisions of the Code are Sections 23–63 (1975), 23–64 (1975), 23–65 (1975), and 23–66 (1975). Section 23–63, entitled "General information on preliminary plat," states:

> The preliminary plat *shall* include the following general information:
>
> (1) Proposed name of the subdivision which shall not duplicate nor resemble the name of another subdivision in the County. The proposed name shall be subject to approval by the director;
>
> (2) Date, northpoint and scale of drawing;
>
> (3) Tax key number and other information to sufficiently describe and define the loca-

tion and boundaries of the proposed subdivision according to the real property records of the State tax office;

(4) Names and addresses of the owner, subdivider, and engineer or surveyor who prepared the plat;

(5) The approximate lot layout and the approximate dimension and area of each lot;

(6) Acreage of proposed subdivision and number of lots; and

(7) A title report issued by a licensed title company in the name of the owner of the land, showing all parties whose consents are necessary and their interests in the premises when required by the director.

(Emphasis added.) Section 23–64, entitled "Existing conditions shown on preliminary plat," states:

The preliminary plat *shall* include the following information on existing conditions:

(1) Location, width and names of all existing or platted streets within or adjacent to the tract, together with easements, other rights-of-way, and other important features, such as corners, property boundary lines, and control of access lines adjacent to State highways;

(2) When required by the director, contours at vertical intervals of five feet where the slope is greater than ten percent. Elevations shall be marked on the contours based on an established bench mark or other datum approved by the director of public works. In addition, the contours as may be required by the manager, State department of health, and director of public works shall be shown;

(3) The location and direction of all water courses and approximate location of areas subject to inundation or storm water overflow;

(4) Existing uses of property, including but not limited to, location of all existing structures, wells, cisterns, private sewage disposal systems, and utilities; and

(5) Zoning on and adjacent to the tract.

(Emphasis added.) Further, Section 23–65, entitled "Proposed plan of land partitioning on preliminary plat," states:

The preliminary plat plan *shall* include the following land partitioning information:

(1) Streets showing location, widths, proposed names, approximate radii or curves. The relationship of all streets to projected streets shown on the County general plan, or if there is no complete County general plan, projected streets suggested by the director to assure adequate traffic circulation in the area;

(2) Existing and proposed easements, showing width and purpose;

(3) Lots, showing approximate dimensions, minimum lot size and proposed lot and block numbers; and

(4) Sites, if any, allocated for purposes other than single-family dwellings.

(Emphasis added.) Finally, Section 23–66, entitled "Explanatory information on preliminary plat," states:

The preliminary plat *shall* include the following explanatory information: If it cannot be shown practicably on the preliminary plat, it shall be submitted in separate statements accompanying the preliminary plat:

(1) A vicinity map at a small scale, showing existing subdivided land ownerships adjacent to the proposed subdivision, and showing how proposed streets may be extended to connect with existing streets;

(2) Proposed deed restrictions in outline form if any;

(3) The approximate location within the subdivision and in the adjoining streets and property of existing sewers and water mains, culverts and drain pipes, electric conduits or lines proposed to be used on the property to be subdivided and invert elevations of sewers at points of proposed connections;

(4) Statement regarding water system to be installed, including source, quality and quantity of water;

(5) Provisions for sewage disposal, drainage and flood control which are proposed. The drainage map shall include the approximate location of areas subject to inundation or storm water overflow and all areas covered by waterways, including

ditches, gullies, streams and drainage courses within or abutting the subdivision;

(6) Parcels of land proposed to be dedicated to public use, and the conditions of such dedication; and

(7) Improvements to be made by the developer and the approximate time such improvements are to be completed. Sufficient detail regarding proposed improvements shall be submitted so that they may be checked for compliance with objectives of these regulations, State laws and other applicable County ordinances.

(Emphasis added.)

### C.

Neither the Board Appellants nor the KEL Appellees contest the court's finding of fact 8, which states that KEL's preliminary plat did not contain information required by Sections 23–64(1), 23–64(4), 23–66(2), 23–66(3), 23–66(4), 23–66(5), 23–66(6), and 23–66(7). As the parties appear to agree that KEL did not meet the requirements of the Code, this analysis is limited to interpretation of the relevant language in the Code.

■■■ This court's primary obligation in construing a statute "is to ascertain and give effect to the intention of the legislature," which "is to be obtained primarily from the language contained in the statute itself." *Franks v. City & County of Honolulu*, 74 Haw. 328, 334, 843 P.2d 668, 671 (1993) (quoting *In re Hawaiian Tel. Co.*, 61 Haw. 572, 577, 608 P.2d 383, 387 (1980)). When construing a statute, "the fundamental starting point is the language of the statute itself[ and] where the statutory language is plain and unambiguous, [the appellate courts'] sole duty is to give effect to its plain and obvious meaning." *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000).

■■■ "Departure from the literal construction of a statute is justified only if such a construction yields an absurd and unjust result obviously inconsistent with the purposes and polices of the statute." *Shin v. McLaughlin*, 89 Hawai'i 1, 4, 967 P.2d 1059, 1062 (1998) (quoting *Alvarez v. Liberty House, Inc.*, 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997)). "When interpreting a mu-

nicipal ordinance, we apply the same rules of construction that we apply to statutes." *Weinberg v. City & County of Honolulu*, 82 Hawai'i 317, 322, 922 P.2d 371, 376 (1996) (quoting *Bishop Square Assoc. v. City & County of Honolulu*, 76 Hawai'i 232, 234, 873 P.2d 770, 772 (1994) (quoting *Waikiki Resort Hotel v. City & County of Honolulu*, 63 Haw. 222, 239, 624 P.2d 1353, 1365 (1981))). "The purpose of the ordinance may be obtained primarily from the language of the ordinance itself[.]" *Id.*

■■■ This court has said that "[w]e may resort to legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms not statutorily defined." *Schefke v. Reliable Collection Agency, Ltd.*, 96 Hawai'i 408, 424, 32 P.3d 52, 68 (2001) (internal quotation marks and citations omitted). *See also, State v. Nomura*, 79 Hawai'i 413, 416, 903 P.2d 718, 721 (App.1995) (stating that "resort to legal or other well accepted dictionaries is one way to determine the ordinary meanings of certain terms not statutorily defined" (internal quotation marks, citations, and brackets omitted)). "Shall" is defined as "will have to" or "must." *Webster's Third New Int'l Dictionary* 2085 (1961). As to the meaning of "shall," it is further stated:

As used in statutes, contracts, or the like, this word is generally imperative or mandatory. In common or ordinary parlance, and in its ordinary signification, the term "shall" is a word of command, and one which has always or which must be given a compulsory meaning; as denoting obligation. *The word in ordinary usage means "must" and is inconsistent with a concept of discretion.*

*Black's Law Dictionary* 1375 (6th ed.1990) (emphasis added). In light of this court's obligation to give the Code its ordinary meaning and the foregoing definition of "shall," it is concluded that the aforementioned provisions of the Code are mandatory and not discretionary. *See Voellmy v. Broderick*, 91 Hawai'i 125, 129, 980 P.2d 999, 1003 (App.1999) (stating that "[t]he word 'shall' 'must be given a compulsory meaning ... and is inconsistent with a concept of discretion'" (quoting *Black's Law Dictionary*

at 1375)); *Gray v. Admin. Dir. of the Court, State of Hawai'i,* 84 Hawai'i 138, 150, 931 P.2d 580, 592 (1997) (observing that "[t]he word 'shall' is generally construed as mandatory in legal acceptation" (quoting *In re Adoption of Watson,* 45 Haw. 69, 79, 361 P.2d 1054, 1059 (1961))). Accordingly, contrary to the Board Appellants' argument, the Director lacked "discretion to accept a subdivision application without strict compliance with the code requirements." As the provisions of the Code are not ambiguous, this court need not look at legislative intent. The argument of the Board Appellants and the KEL Appellees that the court erred in its conclusions of law 2, 3, and 5 is therefore rejected.

### D.

■ In support of its argument that reading the Code provisions as mandatory would produce "an absurd and unjust result," the Board states:

> Evidence was presented that the custom and practice of the Planning Department for over thirty years has been to require basic information to be submitted with the preliminary plat. ... This would include information which showed that the size of the lots conform to the zoning, adequacy of the filing fee, consent of landowners, and so on. However, information on water and wastewater systems[,] for example, need not be submitted until after a review by appropriate agencies such as the Department of Water Supply and what is now the Department of Environmental Management. The comments from these departments as to what would be required are then incorporated into conditions which must be satisfied before final subdivision approval is given. *Requiring all such information when a preliminary approval is sought would be an unnecessary waste of effort.* As a practical matter all such provisions cannot be prepared until all practical aspects of the proposal are settled by the review of appropriate agencies. *Thus, construing the [Code] provisions to be mandatory, would produce an absurd and unjust result. Applicants would have to create plans without the input knowing what conditions would be required by var-*

> *ious state and county departments, resulting in duplication of costs, time and efforts without any additional benefit to anyone.*

(Emphases added.) In *Perry,* this court articulated a three-prong test for determining when the word "shall" may be interpreted as directory. First, "shall" can be read in a non-mandatory sense when a statute's purpose "confute[s] the probability of a compulsory statutory design." 62 Haw. at 676, 619 P.2d at 102. Second, "shall" will not be read as mandatory when "unjust consequences" result. *Id.* Finally, "the word 'shall' may be held to be merely directory, when no advantage is lost, when no right is destroyed, when no benefit is sacrificed, either to the public or to the individual, by giving it that construction." *Id.* at 677, 619 P.2d at 103.

The arguments of the Board Appellants and the KEL Appellees are unavailing. Regarding the first and third prongs, the following testimony was elicited before the Board:

> [Appellee's Counsel]: *What's in your view, the Director's view, the purpose of the subdivision process, the Subdivision Code?*

> [The Director]: *The purpose is to ensure that when development occurs there's adequate access drainage, water supply. Primarily, it's a question of physical, adequacy of physical infrastructure rather than a question of the use of the property or lot sizes which are set by the Zoning Code....*

> Q: *Do you find that the public can help you and your Department make better decisions by providing information to the Department?*

> A: *Very often that's true.* In some cases though, there is, there is not a statutory means to implement what people might want.

> Q: *If the public had more information, could it then provide better information to the Department in making its decisions?*

> A: *I think generally, yes.*

> Q: Is there a provision by which when somebody submits a preliminary subdivision application to the Department, that

notice of that application is made available to those who would like to keep informed of the subdivision process?

A: There's two things. I think the Code requires us to publish a list of subdivision applications received. And I'm not sure that there is, I know that there's a, people can request copies of agendas, but I'm not sure, I suppose if someone requested as a, made a standing request for a list of subdivision applications, we could periodically send that. Although I'm not sure that that's, it's probably covered by public information laws that we would do that.

Q: So you publish a list of applications received. And publication of that, of that list is it fair to assume, gives the public notice so that if they have relevant information, they can provide it to the Department?

A: Well, I'd be guessing what the purpose was, because I'm, honestly there are a number of possible purposes. One is simply to inform the public what's going on. And I'm, I don't, I'm not aware of a, of a statement in the Code that says why. It's published except that there is supposed to be a publication.

Q: But when it is published, that does regardless of the purpose, *the public then does have the ability to provide the Department with information?*

A: *Yes.*

(Emphases added.) The first prong of this test is not met. The Director stated the purpose of the Code was to provide the Board with information regarding drainage and water supply. In that light the purpose of Sections 23–64(3) and 23–66(4) and (5), cited *supra,* is not inconsistent with a compulsory statutory design. As to the third prong, the Director conceded that this information was useful both to "inform the public what's going on," and to provide the Board with better information in making its decision. Such a consideration would be sacrificed, as Appellee argues, if such information were lacking. Therefore, the third prong of the test is also not met.

As to the second prong, the Board Appellants' argument is essentially that strict compliance with the Code is "an unnecessary waste of effort" and expense. This, however, does not lead to the conclusion that construing the Code provisions as mandatory leads to an "unjust consequence." The argument that requiring an applicant to provide information on water and wastewater systems, which would later be subject to comments and conditions imposed by the Department of Water Supply and the Department of Environmental Management would be "absurd" or "unjust," is not persuasive.

Even assuming that some duplication of cost and effort results, the process by which the preliminary plat is to be submitted and the requirements for it are within the province of the legislative branch to prescribe. The Board Appellants have not shown that "an unnecessary waste of effort" is "an absurd and unjust result" that is *obviously* inconsistent with the purposes and policies of the statute" in light of the mandatory language employed in the Code provisions. *Shin,* 89 Hawai'i at 4, 967 P.2d at 1062 (emphasis added). As stated in *Town v. Land Use Comm'n,* 55 Haw. 538, 543, 524 P.2d 84, 88 (1974),

> *neither official construction nor usage, no matter how long indulged in, can be successfully invoked to defeat the purpose and effect of a statute which is free from ambiguity,* nor will the courts be influenced by the construction placed upon a statute by the officials whose duty it is to execute it where such construction is manifestly incorrect.

(Emphasis added.) The Board Appellants' arguments are better addressed to the legislative branch. Accordingly, the second prong of the test is not satisfied. Therefore, the term "shall" in Sections 23–63, 23–64, 23–65, and 23–66 cannot be construed as merely directory.

### E.

The Board Appellants argue that an agreement has been reached regarding a pedestrian easement to the shoreline on the subject property and that KEL must provide a "public pedestrian access plan for approval by the Director" before final approval of the subdi-

vision can be granted. The Board Appellants also reiterate that the original land acquired by KEL has been reduced by the 238 acres that were sold for Park expansion. It would appear that the Board Appellants contend that because of this agreement and land sale for Park expansion, the Board and KEL have attempted to satisfy cultural and community needs. But these matters are wholly irrelevant to compliance with the mandatory requirements of the Code.

### F.

■ Finally, the KEL Appellees argue that "[i]f an agency's construction or usage is consistent with the purpose and effect of a statute or ordinance, and is not manifestly incorrect or unreasonable, it is entitled to deference." This argument is also unpersuasive. As stated *supra,* the Board's interpretation of the Code is contrary to the unambiguous language contained therein. Therefore, the Board's interpretation of the Code is "manifestly incorrect" and "unreasonable." Regarding deference to agency interpretations of statutes, this court has stated that "[t]he rule of judicial deference, however, does not apply when the agency's reading of the statute contravenes the legislature's manifest purpose.... Consequently, we have not hesitated to reject an incorrect or unreasonable statutory construction advanced by the agency entrusted with the statute's implementation." *In re Water Use Permit Applications,* 94 Hawai'i 97, 145, 9 P.3d 409, 457 (2000) (internal citations omitted). The Board's interpretation is not entitled to deference inasmuch as it would contradict the plain language of the Code.

### V.

■ As to their second issue on appeal, the Board Appellants and the KEL Appellees argue that KEL was not required to obtain a SMA Use Permit because the proposed subdivision is not a "development" within the SMA under HRS chapter 205A.[9] In conjunction with these arguments, they assert that the court erred in its conclusions of law 11, 12, 13, 14, 15, 16, and 17.

Pursuant to HRS § 205A–28 (1993), entitled "Permit required for development," "[n]o development shall be allowed in any county within the special management area without obtaining a permit in accordance with this part." The parties agree that the SMA Use Permit requirement is governed by the three-step process found in HRS § 205A–22 (1993) and described by the court in conclusions of law 11, 12, and 13. As set forth by Appellee, this process is as follows:

> The first step is to assess whether the activity is included in the definition of "development." If the activity falls within one of the five categories of activities, then *the second step is to assess whether the activity is excluded pursuant to any of the fifteen categories of excluded activities.* If the activity is "excluded," *the third step is to assess whether the activity may have cumulative impact or significant environmental or ecological effect on a special management area.*

(Emphases added.) HRS § 205A–22 contains the following relevant definitions:

> *"Development"* means any of the uses, activities, or operations on land or in or under water within a special management area that are included below:
>
> . . . .
>
> (3) *Change in the density or intensity of use of land, including but not limited to the division or subdivision of land;*
>
> (4) Change in the intensity of use of water, ecology related thereto, or of access thereto; and
>
> . . . .

---

9. The Board Appellant's opening brief contains the following passage:

> The applicant has withdrawn the subdivision application which is the subject matter of this appeal. Subsequently, the applicant submitted a new subdivision application. The new application consists of property mauka of the Old Government Road (the alaloa). Lot 22 which encompasses the entire shoreline management

area [sic]. Located [sic] makai of the road, is not part of the new application.

However, as the Board Appellants have not withdrawn their point on appeal, the issue as presented must be addressed.

"Makai" is defined as "on the seaside, toward the sea, in the direction of the sea." *Hawaiian Dictionary* at 114.

*"Development" does not include the following:*

. . . .

(11) *Subdivision of land into lots greater than twenty acres in size;*

. . . .

*provided that whenever the authority finds that any excluded use, activity, or operation may have a cumulative impact, or a significant environmental or ecological effect on a special management area, that use, activity, or operation shall be defined as "development" for the purpose of this part.*

"Special management area" means the land extending inland from the shoreline as delineated on the maps filed with the authority as of June 8, 1977, or as amended pursuant to section 205A–23.

The three-step process, then, allows for a proposal to fall within the definition of "development," be excluded from it, and then be reinstated in the definition because of its impact on a SMA. Applying this three-step process to the instant case, it cannot be concluded that the court was wrong in ruling that a SMA Use Permit was required for the proposed subdivision.

### A.

First, neither the Board Appellants nor the KEL Appellees contest the court's finding of fact 4, which states that "a portion of the subject land area is located within the [SMA]." The subdivision application lists a subdivision of a 457–acre parcel of land, which contains a 64–acre plot of land within the SMA. The court was thus correct in concluding that a portion of the subdivision was in the SMA.

The Board Appellants and the KEL Appellees argue that the 64–acre plot of land within the SMA is a separate "pre-existing lot," and even if located in the SMA, it was not being subdivided. They contend, then, that this lot should not be considered in determining whether a SMA use permit is required.

This argument, however, is inconsistent with the subdivision application submitted by KEL.

The application indicated that 457 acres were to be subdivided into 55 lots. The 55 lots are comprised of "40 lots of approximately 5 acres each, 3 lots of approximately 8 acres each, 4 lots of approximately 17 acres each, one 74–acre lot, *one 64–acre lot,* a remainder lot of 96 acres, and 5 roadway lots." (Emphasis added.) Therefore, the 64–acre lot, which is within the SMA, was part of the entire subdivision application and was not annexed from it.[10] As the court concluded in conclusion of law 11, "[s]ubdivisions are included in the definition of 'development.'" It may be noted, further, that in *Sandy Beach Def. Fund v. City Council of the City & County of Honolulu,* 70 Haw. 361, 364–65, 773 P.2d 250, 253 (1989), this court said that "because a portion of the project was located within the boundaries of the '[SMA]' established by the County pursuant to the [Code], [the developer] was required to obtain an SMA permit. HRS § 205A–28." In conjunction with HRS § 205A–28, which provides that "[n]o development shall be allowed in any county within the special management area without obtaining a permit in accordance with this part[,]" *Sandy Beach* can be read to require such a permit in these circumstances.

### B.

The court decided in conclusion of law 12 that "the activity" is an excluded use under HRS § 205A–22(11). HRS § 205A–22(11) excludes subdivisions of land "into lots greater than twenty acres in size" from the definition of "development." *See supra.* According to the court that portion of the subdivision within the SMA is 64 acres and, hence, larger than 20 acres, thus it is an excluded use. The third step of the process, then, applies.

### C.

As to the third step, HRS § 205A–22 states that an excluded use should be defined

---

10. As stated *supra,* a new subdivision application was submitted subsequent to the subdivision application filed by KEL in the instant case. But because the Board Appellants have not with-

drawn this point on appeal, the application is addressed as it is presented in the record. *See supra* note 9.

as a "development" if it *"may* have a cumulative impact, or a significant environmental or ecological effect on a special management area." (Emphasis added.) The KEL Appellees argue that the court should not have reached the third step because it only applies to excluded uses and because there is no "development," there can be no excluded use. The Board Appellants argue that the court's reasoning in step three was flawed as the soil type for the subject property will be primarily bare pāhoehoe [11] with relatively little soil and "ground disturbance" and, therefore, little surface water runoff into the SMA. Therefore, the Board Appellants argue, the proposed subdivision will not have a significant impact on the SMA and should not be defined as a "development" under HRS § 205A–22.

The Board Appellants do not dispute that the Director testified that the project may adversely affect coastal resources. The Board Appellants, however, appear to argue that the Director's entire testimony "indicates that he did not believe that the subdivision at Ki'ilae would result in significant environmental impact." The testimony the Board Appellants refer to is as follows:

> [Appellee's Counsel]: Okay. *Do you acknowledge that this project may adversely affect coastal resources?*
>
> [The Director]: *May, yes.*
>
> ....
>
> Q: Do you believe the County has sufficient ability to prevent runoff such as has occurred at Hokulia at this site?
>
> ....
>
> A: I think I can generally answer the question. I think the, I can answer generally and specifically. Generally, the County, if, we think the grading ordinance needs to be improved in the Department of Public Works has issued, has a contract out to work on a grading ordinance. *On this site, the potential, there's always some potential for runoff from a construction site.* This site has considerably less potential than Hokulia because of the considerably less soil involved, less, much less ground disturbance in the subdivision be-cause Hokulia involved a construction of a golf course, and also involved importation of a considerable amount of soil. I could get into the specifics of the soil type on this subdivision, but most of it is bare pahoehoe. On the northern part of the site, there is an area where there's some thin layer of soil over the pahoehoe. The subdivision itself then stops, the closest point, I think, is 500 feet from the water, that there would be any grading activity for the subdivision itself.

(Emphases added.) Such testimony does not directly purport to retract the Director's earlier statement that the subdivision may adversely affect coastal resources. Accordingly, it cannot be said, as a matter of law, that the court was wrong in its conclusion of law 14, which states that the Director had concluded that the "proposed subdivision 'may adversely affect coastal resources.' "

In its finding of fact 11, the court found that "the [Director] acknowledged that the Ki'ilae Estates Subdivision 'may adversely affect coastal resources.' " Neither the Board Appellants nor the KEL Appellees challenge this finding of fact. Based on the Director's testimony it is not clearly erroneous. This finding supports the court's conclusions of law 14, 15, 16, and 17 and, hence, it cannot be said that the court was wrong in arriving at the said conclusions. The court's conclusion of law 13 merely states the third step of the three-step process which, as stated *supra,* is not disputed by the parties. Accordingly, KEL's proposed subdivision falls within the definition of "development" found in HRS § 205A–22.

### D.

In its amicus brief, PLF appears to argue that an entire subdivision must be located within the SMA for a SMA use permit to be required. As stated *supra,* an entire development need not be within the SMA for a SMA use permit to be required. For the foregoing reasons, the court was correct in determining that a SMA use permit was required.

---

11. "Pāhoehoe" is a "smooth, unbroken type of lava." *Hawaiian Dictionary* at 300.

## VI.

Based on the foregoing, the September 25, 2003 final judgment of the court in favor of Appellee and against the Board Appellants and the KEL Appellees is affirmed.

