**Electronically Filed
Intermediate Court of Appeals
29440
30-APR-2013
08:41 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

KAUAI SPRINGS, INC., Appellant-Appellee,
v.
PLANNING COMMISSION OF THE COUNTY OF KAUAI, Appellee-Appellant.

NO. 29440

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CIVIL NO. 07-1-0042)

APRIL 30, 2013

FOLEY, PRESIDING JUDGE, FUJISE and GINOZA, JJ.

OPINION OF THE COURT BY GINOZA, J.

This secondary agency appeal addresses whether
Appellant Planning Commission of the County of Kaua'i (Planning
Commission) properly denied Appellee Kauai Springs, Inc.'s (Kauai
Springs) combined application for a Use Permit, a Class IV Zoning
Permit, and a Special Permit to continue operating a spring water
bottling facility on land zoned for agricultural use.

The Planning Commission denied the permits to Kauai
Springs by way of a January 23, 2007 Findings of Fact,
Conclusions of Law, Decision and Order (Planning Commission

Order). Kauai Springs then appealed to the Circuit Court of the Fifth Circuit (circuit court).[1]

The circuit court issued its Findings of Fact, Conclusions of Law, and Order (Circuit Court Order) on September 17, 2008, reversing in part and vacating in part the Planning Commission Order. The circuit court ruled, as to the Use Permit and the Class IV Zoning Permit, that they were "deemed approved" pursuant to deadlines for processing the applications imposed by the Kaua'i County Code (KCC), and that Kauai Springs had not assented to an extension of the deadlines. The circuit court further ruled, inter alia, that Kauai Springs had met its burden for the permits, and that the Planning Commission had improperly required Kauai Springs to disprove future events, i.e., requiring Kauai Springs to prove that the Commission on Water Resource Management (Water Commission) and the Public Utilities Commission (PUC) would not exercise jurisdiction. The circuit court thus ordered that all three permits be issued and entered final judgment in favor of Kauai Springs pursuant to the Circuit Court Order.

In its appeal to this court, the Planning Commission asserts that the circuit court erred by: (1) implicitly holding that the Planning Commission had no duty under the public trust doctrine to consider Kauai Springs' water use, (2) concluding that the record lacked evidence that Kauai Springs' existing or proposed uses of ground water might affect resources subject to the public trust, (3) implicitly holding that the Planning Commission considered improper criteria for the permits when the Planning Commission required Kauai Springs to prove the legality of its commercialized use of the water, (4) concluding that Kauai Springs had carried its burden of proof by presenting sufficient evidence that its proposed use of the water was legal, (5) concluding that Kauai Springs was properly integrated into

---

[1] The Honorable Kathleen N.A. Watanabe presided.

the community of uses and met the requirements for the permits, and (6) concluding that Kauai Springs did not assent to extending automatic approval deadlines for the Use Permit and the Class IV Zoning Permit.

In whole, the Planning Commission's points of error present four issues for this court to decide, which will be addressed in the following order:

(1) Whether the circuit court was correct that the Use Permit and the Class IV Zoning Permit were automatically approved pursuant to provisions in the KCC.

(2) Whether the Planning Commission had public trust obligations to review Kauai Springs' use of water.

(3) If the Planning Commission had public trust obligations to review Kauai Springs' use of water, whether the Planning Commission applied the proper standards and criteria in reviewing the application for the permits.

(4) Whether the circuit court was correct that Kauai Springs met its burden of proof to be entitled to the permits.

For the reasons discussed below, we vacate the circuit court's final judgment and remand this case to the Planning Commission for further proceedings consistent with this opinion.

## I. BACKGROUND

Kauai Springs is a water bottling company owned and operated by Jim and Denise Satterfield, and is located in Kōloa, Kauaʻi. The land on which Kauai Springs operates (the Property) is identified as TMK:(4)2-008-002:5 and is within the County of Kauaʻi (County) agricultural district and the State agricultural land use district. Kauai Springs leases the Property and operates out of a 1,600 square-foot building. Prior to applying for the permits that are at issue in this case, Kauai Springs had obtained a building permit from the County to construct a 1,600 square-foot "[bottled] water processing facility," and had also obtained a permit from the State Department of Health (DOH) approving Kauai Springs as a "bottled water manufacturer." The

business operated for a few years with just these permits before it was notified by the County of zoning code violations.

On May 15, 2006, the County of Kaua'i Planning Department (Planning Department) issued a Zoning Compliance Notice to the owner of the Property advising that, after receiving a complaint, it had found violations of the zoning code on the Property.  In particular, the notice stated that "[t]he activity of processing and packaging without the proper permits" was a violation of the zoning code, and that "[t]he use of the [Property] for Industrial processing and packaging purposes is not generally permitted within the Agricultur[al] District." Pursuant to Chapter 8 of the KCC, the notice contained a cease and desist order.

To address the alleged violations, Kauai Springs submitted an application to the Planning Department on July 5, 2006, for a Use Permit, a Class IV Zoning Permit, and a Special Permit.  The Planning Department accepted the application for processing on the same day.

Of note, the Hawai'i Supreme Court's opinion in *Kelly v. 1250 Oceanside Partners*, 111 Hawai'i 205, 140 P.3d 985 (2006) was issued on July 28, 2006, twenty-three days after Kauai Springs submitted its permit application to the Planning Department.  The record indicates that the Planning Commission was cognizant of the ruling in *Kelly* and, in reviewing Kauai Springs' application, sought to address its public trust duties in light of Kauai Springs' use of water in its water bottling operation.

A.    **Permit Application and Planning Commission Hearings**

Kauai Springs' permit application sought to maintain and potentially expand its existing use "for a water harvesting and bottling operation" on the Property, in which spring water originating from Kāhili Mountain is filled into five-gallon recyclable containers to service residents and businesses on the Island of Kaua'i.  At an August 8, 2006 Planning Commission

hearing, Jim Satterfield (Mr. Satterfield) stated that Kauai Springs' productivity was at approximately 300-500 five-gallon bottles per week and he wanted the permits to allow future expansion of its operations to 1,000 five-gallon water bottles per day. Kauai Springs also sought to expand its operation to include bottling the water into smaller biodegradable bottles.

As found by the circuit court and uncontested by the parties, the Property is located miles away from the source of the water and Kauai Springs does not have control over the source or the system that brings the water to the Property. The location of the water source is owned by the Eric A. Knudsen Trust (Knudsen Trust) and the source is an underground spring located approximately one-thousand feet up Kāhili Mountain. Kauai Springs purchases the water from Knudsen Trust. The water is transmitted by way of a gravity-fed private system owned by Grove Farm Company (Grove Farm) which was originally constructed by Kōloa Sugar Mill in the 1890s to irrigate the ahupuaʻa of Kōloa. Kauai Springs receives the water from a pipe that runs across the Property. The water system also provides domestic water to eleven homes along Wailāʻau Road, makai (ocean side) of the Property.

The Planning Commission held four public hearings on the matter,[2] received numerous letters, and heard testimony from members of the public both in opposition to and in support of permit approval. Mr. Satterfield attended each hearing and was accompanied by Kauai Springs' attorney, Harvey Cohen (Cohen), at the last two hearings. The Planning Commission deferred a decision on the application several times in order to gather information and to correspond with other government agencies.

In the hearings, the Planning Commission inquired into Kauai Springs' operations, including how the proposed use of

---

[2] Public hearings on this permit application were held on August 8, 2006; September 26, 2006; November 14, 2006; and November 28, 2006.

operating a water bottling facility may affect the water resources it utilizes and the surrounding lands dependent on the water resources. Kauai Springs purchases the water it uses from Knundsen Trust pursuant to a licensing agreement and, according to Mr. Satterfield, there is no limit on the amount of water Kauai Springs can extract.

At a hearing, Mr. Stacey Wong, Trustee for the Knudsen Trust, explained that two water tunnels were constructed at the water source sometime in the early 1900's by McBryde Sugar Company, and that there is an eight inch pipe line that was used to provide water for people in the sugar plantation. The record further indicates that one of the tunnels, referred to as "Tunnel No. 1," is located at about the 1000-foot elevation and is the access to the water source for the water used in Kauai Springs' operation.

Planning Department staff visited the source to view the water tunnel and the water system. According to a staff report, water from Tunnel No. 1 feeds into a water tank, where it is chlorinated and serves the Kāhili Mountain Park and feeds a line going to Kōloa town. At a certain point, the water line then connects to a Grove Farm operated water tank that is located approximately 200 feet mauka (mountainside) of Kauai Springs' building. Prior to this second water tank, Kauai Springs has installed a tap into the water line which feeds a meter and an underground line to its water bottling facility.

The record does not contain verified data on the amount of water flowing through Tunnel No. 1 that is utilized by Kauai Springs for its operations and/or utilized by surrounding homes before the water eventually feeds back into nearby streams.

Consistent with its rules, the Planning Department also sought input from various state and county agencies including the DOH, the State Historic Preservation Division, the County Fire Department, the County Department of Public Works, the County Department of Water, the State Land Use Commission, the Water

Commission, and the PUC. *See* Rules of Practice and Procedure of the Kaua'i County Planning Commission (Planning Commission Rules) § 1-13-4(2) (stating that Special Permit applications may be routed to appropriate government agencies for comments and recommendations); KCC §§ 8-19.5(b), 8-19.6(b).[3]

The Planning Commission was particularly concerned with the input, or the perceived lack of input, it received from the Water Commission[4] and the PUC.[5]

1. **Water Commission Comments**

The Water Commission first responded to the Planning Department's request for input on the permit application by letter, providing its comment that

> 3. There may be the potential for ground or surface water degradation/contamination and recommend that approvals for this project be conditioned upon a review by the State [DOH] and the developer's acceptance of any resulting requirements related to water quality.

The Water Commission also commented that "[g]round-water[6] withdrawals from this project may affect streamflows, which may require an instream flow standard[7] amendment." The letter also stated that

---

[3] KCC § 8-19.5(b) and KCC § 8-19.6(b), with respect to Use Permits and Class IV Zoning Permits, state that the Planning Director or his designee "shall refer the application to the Department of Public Works and the Department of Water and may refer the application to any other County or State Department for comment or approval" and "may require additional information if necessary to make a determination."

[4] Under article XI, section 7 of the State constitution, the Water Commission is designated as the primary guardian of public rights under the water resources trust. *See* Haw. Const. art. XI, § 7; *see also In re Water Use Permit Applications*, 94 Hawai'i 97, 143, 9 P.3d 409, 455 (2000).

[5] The powers and duties of the PUC are set forth in HRS Chapter 269.

[6] The State Water Code defines "ground water" as "any water found beneath the surface of the earth, whether in perched supply, dike-confined, flowing, or percolating in underground channels or streams, under artesian pressure or not, or otherwise." HRS § 174C-3 (2011 Repl.).

[7] An instream flow standard (IFS) is a "quantity or flow of water or depth of water which is required to be present at a specific location in a stream system at certain specified times of the year to protect fishery, wildlife, recreational, aesthetic, scenic, and other beneficial instream uses." HRS § 174C-3.

OTHER:

. . .

The island of Kauai has not been designated as a ground-water management area;[8] therefore, a water use permit from the Commission is not required to use the existing source(s)[9] or to change the type of water use. However, if the source needs to be modified in any way, a well modification permit from the Commission may be required. In addition, if a pump is to be installed to induce additional water flow, a pump installation permit from the Commission would be required. If the source is modified to induce additional water flow, and the modification results in impacts to surface waters,[10] a petition to amend the interim instream flow standard[11] for affected surface waters must be made and approved prior to the use of the water.

The Planning Department subsequently requested clarification of these comments in a letter stating:

Pursuant to several conversations with [Water Commission staff], Planning Department staff understands that provided the following apply, no permit is required for the Applicant's use of water from the existing water system:

---

[8] The State Water Code defines "water management area" as "a geographic area which has been designated pursuant to section 174C-41 as requiring management of the ground or surface water resource, or both." HRS § 174C-3.

[9] The State Water Code defines a "water source" as

a place within or from which water is or may be developed, including but not limited to: (1) generally, an area such as a watershed defined by topographic boundaries, or a definitive ground water body; and (2) specifically, a particular stream, other surface water body, spring, tunnel, or well or related combination thereof.

HRS § 174C-3.

[10] The State Water Code defines "surface water" as

both contained surface water -- that is, water upon the surface of the earth in bounds created naturally or artificially including, but not limited to, streams, other watercourses, lakes, reservoirs, and coastal waters subject to state jurisdiction -- and diffused surface water -- that is, water occurring upon the surface of the ground other than in contained water bodies. Water from natural springs is surface water when it exits from the spring onto the earth's surface.

HRS § 174C-3.

[11] An interim instream flow standard (IIFS) is a "temporary instream flow standard of immediate applicability, adopted by the [Water Commission] without the necessity of a public hearing, and terminating upon the establishment of an instream flow standard." HRS § 174C-3.

> (a) The tunnel is not being changed, and the
> Applicant's use of the water is not affecting the
> source in any way (i.e. not inducing more water to
> come out of the source or tunnel)
>
> (b) The existing source has been registered and is
> basically grandfathered, and there is an agreement
> between the new user (Applicant) and the operator
> of the system.
>
> (c) There is a closed line from the tunnel to the tank.
>
> Please advise if you concur with the foregoing, and if
> pursuant to those conditions, no permit is required from
> [the Water Commission].

(Emphasis added.)  In a second letter, the Water Commission concurred with the Planning Department's summary of its previous comments and "confirm[ed] that no permits from the [Water] Commission are required for the proposed use of water under the three conditions outlined in your letter." (emphases added).  The Water Commission's response did not affirmatively verify that the three conditions outlined in the Planning Department's letter actually existed.

   2.   **PUC Comments**

With respect to possible regulation by the PUC, Mark Hubbard, a Grove Farm consultant, testified to the Planning Commission that to his knowledge, Grove Farm had not communicated with the PUC.  The Planning Department solicited input from the PUC on the application and the PUC responded to the Planning Department by letter, stating that Kauai Springs does not appear to be a public utility subject to its jurisdiction.  The PUC further stated that there is a possibility that Grove Farm may be operating as a public utility under HRS Chapter 269 and "[a]dditional information, including a review of all relevant facts and possibly testimony from all concerned parties, would be necessary before a determination could be made as to whether Grove Farm is a public utility under HRS Chapter 269."  The PUC's response indicated it was an informal and non-binding opinion, and that "[i]f you require a formal opinion on this matter, you may file a petition for declaratory relief[.]"

B.    Planning Commission Order

On November 28, 2006, the Planning Commission discussed conditioning a permit approval on a favorable declaratory ruling from the PUC and the Water Commission.  The Planning Commission voted instead to close the public hearing on the matter when commission members realized that the automatic approval deadline for the Special Permit was approaching.[12]

On January 23, 2007, the Planning Commission voted 6-1 to deny all three requested permits and issued the Planning Commission Order which concluded that:

1.    The Commission has jurisdiction over the subject permits under provisions of Article XIV of the Kauai County Charter, Section[] 8-20.5 and Section 8-21.2 of the Comprehensive Zoning Ordinance, and Chapter 13 of the Rules of Practice and Procedures of the Kauai Planning Commission.

2.    Due notice was given and all parties were offered an opportunity to present evidence and argument on the requested permits.

3.    In view of the comments received from [the Water Commission] and PUC the land use permit process should insure that all applicable requirements and regulatory processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits.  The Applicant, as a party to this proceeding should also carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency.

4.    There is no substantive evidence that the Applicant has any legal standing and authority to extract and sell the water on a commercial basis.

_____

[12]  According to the Planning Commission Rules, the Planning Commission has 60 days after the close of the public hearing to take a vote on a Special Permit petition, but must vote no later than 210 days after the acceptance of an application.  Planning Commission Rules § 13-7(a).  If the Planning Commission fails to act within the aforementioned time period, the petition "shall be deemed approved after an additional thirty (30) days subject to such protective restrictions as may be deemed necessary and as permitted under HRS 205-6(c)."  *Id.* § 13-8(a)(2).  The Planning Commission accepted Kauai Springs' application for processing on July 5, 2006.  Thus, under the time limitations, the Planning Commission had to take action on the application by January 31, 2007.

Kauai Springs requested reconsideration, which the Planning
Commission denied.

## C.   Circuit Court Proceedings and Order

On March 15, 2007, Kauai Springs appealed to the
circuit court, essentially arguing that the Planning Commission
Order disregarded the permit standards and improperly placed the
burden on Kauai Springs to prove that its use of the water would
not be subject to regulation by the Water Commission and the
PUC.[13]

On May 15, 2007, the circuit court granted Kauai
Springs' request for a preliminary injunction and enjoined the
Planning Commission from enforcing its order.

On September 17, 2008, the circuit court issued its
order and entered the following relevant findings of fact (FOFs)
and conclusions of law (COLs):

### FINDINGS OF FACT

. . .

54. The [Planning Commission Order] stated the Water
    Commission informed the Planning Commission that Kauai
    Springs required "no permits" because "the Applicant's
    use of the water is not affecting the source in any way
    (i.e., not inducing more water to come out of the
    source or tunnel)," "the existing source has been
    registered and is basically grandfathered, and there is
    an agreement between the new user (Applicant) and the
    operator of the system," and "there is a closed line
    from the tunnel to the tank." . . . .

. . .

### CONCLUSIONS OF LAW

. . .

Kauai Springs Did Not Waive the Deadlines, or Assent To An
Extension

32. Kauai Springs appeared at the Planning Commission
    hearings on its permit applications, but its presence

---

[13]   Kauai Springs argued that the Planning Commission Order violated
HRS § 91-14(g)(1)-(6) (2012 Repl.) because it was: (1) in violation of
statutory provisions; (2) in excess of the statutory authority or jurisdiction
of the agency; (3) made upon unlawful procedure; (4) affected by other error
of law; (5) clearly erroneous; and (6) arbitrary or capricious.

and participation did not constitute a waiver of the deadlines to which the Planning Commission was obligated to adhere, and was not consent to or affirmation of an extension of time for the Planning Commission to act on the applications. *See, e.g., October Twenty-Four, Inc. v. Planning and Zoning Comm'n,* 646 A.2d 926, 931-32 (Conn. Ct. App. 1994).

. . .

36. Kauai Springs did not ask for extra time, nor did it withdraw its applications.

. . .

40. The failure to adhere to the time requirements was due solely to the actions of the Planning Commission.

**Use Permit Standards**

41. The Planning Commission did not consider the proper criteria when reviewing and processing Kauai Springs' zoning permit applications. The applicable standards for whether Use, Special, and Class IV permits should be issued are clearly established.

. . .

43. Kauai Springs is properly integrated into the community of uses. It had been operating without issue and with all the state and county permits necessary including two County building permits. The Planning Department staffer remarked about Kauai Springs, "[t]he existing water bottling facility is relatively low impact at the subject location in its current function and capacity." . . . .

. . .

45. There is nothing in the [Planning Commission Order] or the Record to indicate that Kauai Springs' existing or proposed uses were not or will not be integrated.

. . .

59. The [Planning Commission Order] contains no finding, and there is no evidence in the Record, that Kauai Springs did not meet the criteria for issuing the three permits at issue in this appeal.

**Public Trust**

. . .

61. The State of Hawaii and its political subdivisions have duties under the public trust. Haw. Const. art. IX; *Kelly v. 1250 Oceanside Partners,* 111 Haw. 205, 140 P.3d 985 (2006).

12

62. "Political subdivisions" of the State include the County of Kauai. *Kelly v. 1250 Oceanside Partners*, 111 Haw. 205, 140. P.3d 985 (2006).

63. Decisions on permit applications must be grounded in fact and the Record, not speculation, and the Record in this case is devoid of any evidence that Kauai Springs['] existing or proposed uses might affect water resources subject to the public trust.

. . .

71. The Planning Commission did not identify any other outstanding regulatory processes that it claimed must have been fulfilled in order to satisfy any duty under the public trust that it may have had.

72. There is nothing in the Record of this case to show that the Planning Commission did not fulfill any duty it may have under the public trust. *Kelly v. 1250 Oceanside Partners,* 111 Haw. 205, 140 P.3d 985 (2006).

**Burden of Proof**

73. If Kauai Springs bore the burden of proof that its proposed use did "not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency," Kauai Springs plainly carried that burden of proof. Both of these agencies had provided their input to the Planning Commission, and neither agency had any substantial concerns with Kauai Springs, as reflected in the [Planning Commission Order]. . . .

74. There was no evidence presented at the public hearings, and no findings made by the Planning Commission that Kauai Springs did not carry any of its burdens to show it was entitled to the three permits at issue in this appeal, and the Planning Commission was clearly erroneous when it determined that Kauai Springs did not meet the burden on the zoning permit applications. Haw. Rev. Stat. § 91-14(g).

75. Conclusions of Law #3 and #4 in the [Planning Commission Order] do not apply the governing legal standards set forth in Finding of Fact #15, #16, and #17, and state only that the Planning Commission denied the applications because Kauai Springs had not disproven that the Water Commission or the PUC might not exercise jurisdiction, despite the fact that the Planning Commission and the Planning Department actually knew both of these agencies repeatedly had disclaimed jurisdiction. Conclusions of Law #3 and #4 are wrong. Because of factual inaccuracies mischaracterizing the Water Commission and PUC letter are unsupported by the Record [sic], FOF #19 is clearly erroneous and must be reversed. Haw. Rev. Stat. 91-14 (g)(5).

The circuit court ultimately reversed the Planning Commission Order with regard to the Use Permit and the Class IV Zoning Permit, ruling that the application for these permits had been automatically deemed approved. In this regard, the circuit court ruled that the deadline for granting or denying these permits had expired before the Planning Commission Order was issued and Kauai Springs had not consented to an extension of the deadlines. The circuit court thus ordered that the Use Permit and the Class IV Zoning Permit be issued forthwith.

The circuit court further ruled that the Planning Commission Order "exceeds the Planning Commission's authority or jurisdiction, is clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; and is arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion." The circuit court thus vacated the Planning Commission Order with regard to the Special Permit and remanded the case to the Planning Commission with an order to issue the Special Permit immediately. The court further permanently enjoined the Planning Commission from enforcing its order or taking any actions that would be contrary to the issuance of the three permits.

## II. STANDARDS OF REVIEW

### A. Public Trust

The Planning Commission's points of error related to the public trust doctrine implicate questions of constitutional law, which this court answers "by exercising its own independent judgment based on the facts of the case, and, thus, questions of constitutional law are reviewed on appeal under the right or wrong standard." *Kelly*, 111 Hawai'i at 221, 140 P.3d at 1001 (quoting *Freitas v. Admin. Dir. of Courts*, 108 Hawai'i 31, 37, 116 P.3d 673, 679 (2005) (brackets omitted)). "Under the right or wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it." *Id.* (quoting *Leslie v. Estate of Tavares*,

91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (brackets omitted)).

B.    **Secondary Appeal**

Regarding appeals from agency decisions generally, the Hawai'i Supreme Court has stated:

> This court's review is ... qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences. *Konno v. County of Hawai'i*, 85 Hawai'i 61, 77, 937 P.2d 397, 413 (1997) (citations omitted).

*In re Water Use Permit Applications*, 94 Hawai'i 97, 118-19, 9 P.3d 409, 430-31 (2000) (hereinafter *Waiāhole I*) (quoting *GATRI v. Blane*, 88 Hawai'i 108, 112, 962 P.2d 367, 371 (1998)). However, this court's deference to agencies is further qualified by the principle that "the ultimate authority to interpret and defend the public trust in Hawai'i rests with the courts of this state." *Id.* at 143, 9 P.3d at 455.

"Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision." *Leslie v. Bd. of Appeals of the Cnty. of Hawai'i*, 109 Hawai'i 384, 391, 126 P.3d 1071, 1078 (2006) (citation and internal quotation marks omitted). To determine if the circuit court's decision is right or wrong, we "apply the standards set forth in HRS § 91-14(g) to the agency's decision." *Id.* (citation omitted). HRS § 91-14(g) (2012 Repl.) enumerates the standards of review applicable to an agency appeal and provides:

> (g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> (1)   In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"It is well settled 'that in an appeal from a circuit court's review of an administrative decision the appellate court will utilize identical standards applied by the circuit court. The clearly erroneous standard governs an agency's findings of fact.'" *Leslie*, 109 Hawaiʻi at 391, 126 P.3d at 1078 (brackets and citation omitted). "An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made." *Id.* (citation and internal quotation omitted). "The courts may freely review an agency's conclusions of law." *Id.* (brackets, citations and internal quotation mark omitted).

## III. DISCUSSION

### A. Assent to Extend Automatic Approval Deadlines

We first address whether the circuit court was correct that the Use Permit and the Class IV Zoning Permit were automatically approved pursuant to provisions in the KCC. In this regard, the circuit court ruled that automatic approval deadlines applied because Kauai Springs had not assented to an extension of the deadlines for the Use Permit and the Class IV Zoning Permit.[14]

---

[14] There is no issue as to timely action for the Special Permit. The circuit court determined, and it is unchallenged, that the Planning Commission had up to January 31, 2007 (or 210 days after the permit application was accepted) to take action on the Special Permit. *See* Planning Commission Rules §§ 1-13-7 and 1-13-8. The Planning Commission Order was issued on January 23,
(continued...)

HRS § 91-13.5 (Supp. 2006) requires state and county agencies to adopt rules specifying a maximum time period to grant or deny, *inter alia*, a development-related permit.  This statute states in relevant part:

§91-13.5 **Maximum time period for business or development-related permits, licenses, or approvals; automatic approval; extensions.**(a) Unless otherwise provided by law, <u>an agency shall adopt rules that specify a maximum time period to grant or deny a business or development-related permit</u>, license, or approval; . . .

. . .

(c) All such issuing agencies <u>shall take action to grant or deny any application for a business or development-related permit, license, or approval within the established maximum period of time, or the application shall be deemed approved</u>; provided that a delay in granting or denying an application caused by the lack of quorum at a regular meeting of the issuing agency shall not result in approval under this subsection; provided further that any subsequent lack of quorum at a regular meeting of the issuing agency that delays the same matter shall not give cause for further extension, unless an extension is agreed to by all parties.

. . .

(e) The maximum period of time established pursuant to this section shall be extended in the event of a national disaster, state emergency, or union strike, which would prevent the applicant, the agency, or the department from fulfilling application or review requirements.

(Emphases added.)

Even prior to the adoption of HRS § 91-13.5, the County had adopted maximum time periods for the Planning Commission to act on the types of permits involved in this case.  Under the applicable county ordinances, the circuit court determined and it is not contested that the deadline for the Planning Commission to act on the Use Permit application was October 18, 2006, which was 105 days from the acceptance of the application.  *See* KCC § 8-20.6 and § 8-19.5.  The parties also do not contest the circuit court's determination that the deadline for the Planning

---

[14](...continued)
2007, prior to the deadline for the Special Permit.

Commission to act on the Class IV Zoning Permit application was November 2, 2006, which was 120 days after the application was accepted. *See* KCC § 8-19.6. The Planning Commission Order was issued on January 23, 2007, *after* the deadlines related to the Use Permit and the Class IV Zoning Permit had expired.

However, the ordinances applicable to a Use Permit and a Class IV Zoning Permit provide that, "[i]f the Planning Director or the Planning Commission fails to take action within the time limits prescribed in this Article, underline the applicant assents to a delay, the application shall be deemed approved." KCC § 8-19.5(g); KCC § 8-19.6(e) (emphasis added). The circuit court held that Kauai Springs did not assent to a delay of the prescribed time limits. The Planning Commission contests this ruling and argues that Kauai Springs did assent to a delay and therefore the Use Permit and Class IV Zoning Permit were not automatically approved once the respective deadlines had passed.

In response, Kauai Springs argues that if the county ordinances allow assent to extend the deadlines, they violate the superior state law set forth in HRS § 91-13.5 and are invalid. Kauai Springs relies on HRS § 46-1.5(13) (Supp. 2005) and HRS § 50-15 (2012 Repl.). HRS § 46-1.5(13) provides that each county has the power to enact ordinances "not inconsistent with, or tending to defeat, the intent of any state statute[.]" In turn, HRS § 50-15 provides that

> [n]otwithstanding the provisions of this chapter, there is expressly reserved to the state legislature the power to enact all laws of general application throughout the State on matters of concern and interest and laws relating to the fiscal powers of the counties, and neither a charter nor ordinances adopted under a charter shall be in conflict therewith.

Kauai Springs contends that under HRS § 91-13.5(e), "assent" is not one of the three enumerated circumstances under which the time periods designated by the agencies could be extended, and the inclusion of the specific reasons to extend the time periods in the statute implies the exclusion of others. Kauai Springs

argues that the County ordinances are thus in conflict with
HRS § 91-13.5(e) and are invalid in allowing assent to extend the
deadlines. We do not agree.

HRS § 91-13.5 is silent as to whether counties may, by
code or rule, provide for assent provisions. HRS § 91-13.5(e)
provides for three situations in which the maximum time period
shall be extended, stating:

> The maximum period of time established pursuant to this
> section shall be extended in the event of a national
> disaster, state emergency, or union strike, which would
> prevent the applicant, the agency, or the department from
> fulfilling application or review requirements.

(Emphasis added.) The inclusion of the mandatory reasons for
extending the time periods does not necessarily indicate an
intent to preclude counties from adopting other reasons why the
time periods may be extended. See Int'l S&L Ass'n v. Wiig, 82
Hawai'i 197, 201, 921 P.2d 117, 121 (1996) ("[t]he inclusion of a
specific matter in a statute implies the exclusion of another
'only where in the natural association of ideas the contrast
between a specific subject matter which is expressed and one
which is not mentioned leads to an inference that the latter was
not intended to be included within the statute.'" (citation
omitted)).

"A test to determine whether an ordinance conflicts
with a statute is whether it prohibits what the statute permits
or permits what the statute prohibits." Waikiki Resort Hotel,
Inc. v. City & Cnty. of Honolulu, 63 Haw. 222, 241, 624 P.2d
1353, 1366 (1981). As to the issue of whether HRS § 91-13.5
prohibits the challenged assent provisions, HRS § 91-13.5 is
ambiguous. See Gillan v. Government Employees Ins. Co., 119
Hawai'i 109, 117, 194 P.3d 1071, 1079 (2008) ("When there is
doubt, doubleness of meaning, or indistinctiveness or uncertainty
of an expression used in a statute, an ambiguity exists."
(citation and internal quotation mark omitted)). HRS § 91-13.5
neither explicitly allows or disallows the adoption of rules or

ordinances which provide that the period for automatic approval may be extended. In construing an ambiguous statute, a court may resort to extrinsic aids in determining legislative intent, one of which is legislative history. *Gillan*, at 119, 194 P.3d at 1081.

While the legislative history indicates that the purposes for enacting HRS § 91-13.5 include streamlining administrative processes and improving Hawaii's business climate, *see* 1998 Haw. Sess. Laws Act 164, § 1 at 613, the legislative history as a whole contemplates flexibility in rule-making and a balance between streamlining on one hand and constitutional demands, public input, and environmental concerns on the other hand, and leads us to conclude that the challenged assent provisions do not conflict with HRS § 91-13.5. *See* Conf. Comm. Rep. No. 127, in 1998 Senate Journal, at 799 ("Your Committee on Conference notes the continued concerns of some that automatic permit approval will be misused to short-circuit existing public input processes. Your Committee is confident that agencies will account for the preservation of such processes in their rulemaking."); S. Stand. Comm. Rep. No. 2386, in 1998 Senate Journal, at 976-77 ("Your Committees find that establishing time frames will compel agencies to prioritize permitting and approval activities, streamline and eliminate any requirements for unnecessary application information, and in the process identify critical application information. This can be accomplished by establishing time frames that are goals rather than 'maximums'."); S. Stand. Comm. Rep. No. 2760, in 1998 Senate Journal, at 1121 ("In streamlining the approval process your Committee is also mindful of environmental concerns. This bill is not intended to jeopardize the environment. The provisions in this bill are intended to allow for the continued safeguard of legitimate review and public comment on those issues.").

Having concluded that the assent provisions in KCC § 8-19.5(g) and KCC § 8-19.6(e) do not conflict with HRS § 91-13.5,

we turn to whether the circuit court correctly determined that Kauai Springs did not assent to an extension of the maximum time periods for the Use Permit and the Class IV Zoning Permit.

The word "assent" is not defined by the applicable county ordinances. However, Black's Law Dictionary defines assent as "[a]greement, approval, or permission; esp., verbal or nonverbal conduct reasonably interpreted as willingness." *Black's Law Dictionary* 132 (9th ed. 2009). The types of assent include the following:

> **apparent assent.** Assent given by language or conduct that, while not necessarily intended to express willingness, would be understood by a reasonable person to be so intended and is actually so understood.
>
> **constructive assent.** [ ] Assent imputed to someone based on conduct.
>
> . . .
>
> **implied assent.** [ ] Assent inferred from one's conduct rather than from direct expression.

*Id.* Unlike assent, waiver necessarily involves the intentional relinquishment of a known right. *See Coon v. City & Cnty. of Honolulu*, 98 Hawaiʻi 233, 261, 47 P.3d 348, 376 (2002) ("Generally, waiver is defined as an intentional relinquishment of a known right, a voluntary relinquishment of rights, and the relinquishment or refusal to use a right." (citations omitted)).

The Planning Commission argues that by its conduct, Kauai Springs led the Planning Commission to reasonably believe that Kauai Springs assented to a delay in the final decision on the Use and Class IV Zoning Permits. In our view, as to the question of assent, the relevant conduct of Kauai Springs includes both verbal and nonverbal conduct that can be reasonably interpreted as willingness to extend the applicable automatic approval deadlines, *see Black's Law Dictionary* 132 (9th ed. 2009), and thus we hold that the circuit court erred in concluding that Kauai Springs did not assent to extend the

automatic approval deadlines for the Use Permit and Class IV
Zoning Permit.

At a November 14, 2006 hearing, almost a month after
the Use Permit deadline had elapsed and more than one week after
the Class IV Zoning Permit deadline had passed, Kauai Springs,
through its attorney, amended its original application to seek
approval for only the current needs of the water-bottling
operation rather than allowing for company growth.

At a November 28, 2006 hearing, Kauai Springs' attorney
retracted his earlier amendment and asked the Planning Commission
to consider its original application, which contemplated company
growth.  Kauai Springs' attorney also continued to negotiate for
the granting of a conditional Use Permit:

> Chair: Yes. I would ask in light of public comment
> whether you would be willing to accept the restriction on
> the Use Permit that it would be for the use of the applicant
> only, it's not transferable and that should you sell the
> business that the Commission would have the right to review
> the Use Permit?
>
> Mr. Cohen: Yes.

At a January 23, 2007 hearing, Kauai Springs' attorney
expressed his surprise with the Planning Commission's decision to
deny the permit application, stating that "I think where we were
heading and correct me if I'm wrong was a conditioned approval,
conditioned upon clarifying some of these water right issues."
He further asked the Planning Commission to "reconsider this
outright denial."

At a February 13, 2007 hearing, Kauai Springs' attorney
urged the Planning Commission to reconsider its decision, offered
to accept conditional permits, and asked for another continuance
in order to obtain more evidence pertaining to the issue of water
rights, stating:

> Again we were willing to put all sorts of conditions
> and I know you have a long docket ahead of you.  What we
> would like is for you to vote to reconsider and then
> continue this matter to a time in the not [too] distant
> future when we can all get our arms around any of the
> remaining issues . . . .   I don't see any downside in

> continuing this matter until we are certain and you
> gentlemen are certain that he is indeed operating outside
> the limits of the law.  I don't think we are going to find
> that out but it sure would be nice to get to that point.  So
> I thank you.

At no point in time did Kauai Springs assert that its permit application had been automatically approved.

Kauai Springs argues that "merely appearing at a hearing after an auto approve deadline has passed does not constitute waiver or affirmation[,]" citing *October Twenty-Four, Inc. v. Planning & Zoning Comm'n*, 646 A.2d 926, 931-32 (Conn. App. Ct. 1994) and *Frito-Lay, Inc. v. Planning & Zoning Comm'n*, 538 A.2d 1039 (Conn. 1988).  However, as outlined above, Kauai Springs actively participated in hearings, asked for a continuance of the matter, actively negotiated, and opposed and sought reconsideration of the denial of the permits after the applicable auto-approve deadlines had passed.  Furthermore, the courts in *October Twenty-Four* and *Frito Lay* addressed the separate issue of <u>waiver</u> of an automatic approval deadline, as opposed to the issue of <u>assent</u> to an extension of an automatic approval deadline as specifically allowed by ordinance.

The circuit court erred in concluding that Kauai Springs did not assent to an extension of the deadlines to take action on the Use Permit and the Class IV Zoning Permit, and therefore these permits were not automatically approved based on expiration of the applicable time periods.

B.   **Public Trust Doctrine Related to Water Resources**

With regard to the public trust doctrine, the Planning Commission takes issue with two COLs by the circuit court which the Planning Commission contends raise doubt as to whether it had public trust duties.  Specifically, the Planning Commission challenges COLs 71 and 72 in the Circuit Court Order, which state:

> 71.   The Planning Commission did not identify any other
>        outstanding regulatory processes that it claimed must
>        have been fulfilled in order to satisfy any duty under
>        the public trust that it <u>may</u> have had.

> 72. There is nothing in the Record of this case to show that the Planning Commission did not fulfill any duty it <u>may</u> have under the public trust. *Kelly v. 1250 Oceanside Partners, 111 Haw. 205, 140 P.3d 985 (2006).*

(Emphasis added.) The Planning Commission argues that because of the indefinite nature of these COLs, referencing any duty that the Planning Commission "may" have under the public trust doctrine, the circuit court implicitly held that the Planning Commission had no duty under the public trust doctrine to consider Kauai Springs' water use in this matter.

The Planning Commission also challenges COL 63, which states:

> 63. Decisions on permit applications must be grounded in fact and the Record, not speculation, and the Record in this case is devoid of any evidence that Kauai Springs['] existing or proposed uses might affect water resources subject to the public trust.

The Planning Commission argues that it does not matter that Knudsen Trust owns the land containing the water source or that Grove Farm owns the water transport system, but rather, because the public trust doctrine applies to all water resources, it could not overlook Kauai Springs' commercialized use of water. The Planning Commission thus contends that because Kauai Springs sought to greatly increase its bottling and commercialization of drinking water taken from a ground water source, and because Kauai Springs had not investigated its rights (or the rights of the Knudsen Trust or Grove Farm) related to the water, there was ample evidence that Kauai Springs' existing or proposed use might affect resources subject to the public trust. Given these public trust implications, the Planning Commission contends that Kauai Springs was required to show that its commercialized use of the water resources "was legal."

In response, Kauai Springs argues that the Planning Commission misreads the Circuit Court Order, because the circuit court did recognize that the Planning Commission had public trust duties and the court determined that those duties had been

satisfied. Kauai Springs further argues that, because its permit application did not seek permission to take or extract water (because it does not control the water source) and all it does is open a tap on a pipeline that crosses the Property, it is no different than any other business that purchases water from another.

Kauai Springs thus contends that the Planning Commission's public trust inquiry is limited to whether public resources would be impacted by Kauai Springs' *building* on agriculturally-zoned land, and the public trust obligation does not authorize the Planning Commission "to turn the usual zoning permit process into an open-ended and standardless [sic] inquiry in which it is free to stray outside of its delegated responsibilities merely because a connection can be made between a permit application and water resources." Rather, according to Kauai Springs, the Planning Commission took "reasonable measures" and made "appropriate assessments" to protect public trust resources by seeking input from other government agencies, and had before it information satisfying the permit criteria as well as affirmative evidence that the use would not affect public trust resources. Ultimately, Kauai Springs argues that the Planning Commission fulfilled its public trust duties, but wrongfully denied the permit application by requiring Kauai Springs to exhaust "outstanding regulatory processes," *i.e.* by requiring that Kauai Springs had the burden to show that "the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency."

Given these arguments, the parties do not dispute that the County generally has public trust duties. The dispute in this case centers more specifically on the *scope* of the County's public trust duties and the applicable *standards or criteria* that the County (through the Planning Commission) is authorized to employ in reviewing the application for the three permits. Thus,

we must determine: (1) whether the County's public trust duties extend to a review of Kauai Springs' use of ground water in its water bottling operation or is limited to just reviewing Kauai Springs' building on the Property; and (2) what are the applicable standards and criteria that the Planning Commission should apply in fulfilling its public trust duties.

1.    **The Planning Commission's Public Trust Duties Extend To Reviewing Kauai Springs' Use of Water**

The parties do not dispute that the public trust duties required under article XI, section 1 of the Hawaiʻi Constitution apply to the County.  Article XI, section 1, promulgated in 1978, provides:

> Conservation and Development of Resources
>
> Section 1. For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.
>
> All public natural resources are held in trust by the State for the benefit of the people.

(Emphasis added.)

In *Kelly*, the Hawaiʻi Supreme Court ruled that the County of Hawaiʻi was a political subdivision of the State pursuant to article VIII, section I of the Hawaiʻi Constitution, and in turn, "the plain language of article XI, section 1 mandates that the County does have an obligation to conserve and protect the [S]tate's natural resources."  111 Hawaiʻi at 224-25, 140 P.3d at 1004-05.  The same holds true for the County in this case.

Here, the Circuit Court Order cites to *Kelly* in COLs 61 and 62, concluding that "[t]he State of Hawaii and its political subdivisions have duties under the public trust[]" and that the "'[p]olitical subdivisions' of the State include the County of Kauai."  Therefore, the circuit court clearly recognized that the

Planning Commission had duties under the public trust doctrine, generally.

As noted above, however, the dispute in this case centers on whether the public trust duties under article XI, section 1 extend to a review of Kauai Springs' existing and proposed *use of water* for its operations. In this regard, the Circuit Court Order is somewhat conflicting, first ruling in COL 63 that the record "is devoid of any evidence that Kauai Springs['s] existing or proposed uses might affect water resources subject to the public trust[,]" but then apparently suggesting in COLs 71 and 72 that the Planning Commission "may" have public trust duties in this case. We conclude that the circuit court's COLs 63, 71 and 72 are incorrect in that they do not recognize the Planning Commission's public trust duty to consider and review Kauai Springs' water usage in its water bottling operation.

First, Hawai'i law has consistently recognized water resources as a part of a public trust.[15] This public trust has its genesis in the common law. *See Waiāhole I*, 94 Hawai'i at 130, 9 P.3d at 442. The Hawai'i Supreme Court has declared that "the right to water is one of the most important usufruct of lands, and it appears clear . . . that . . . the right to water was specifically and definitely reserved for the people of Hawai[']i for their common good in all of the land grants."

---

[15] Early Hawai'i Supreme Court decisions acknowledged that Hawaii's system of laws governing water is "based upon and is the outgrowth of ancient Hawaiian customs and methods of Hawaiians in dealing with the subject of water." *Territory v. Gay*, 31 Haw. 376, 395 (1930). The system was of a cooperative nature and based on a stable "spirit of mutual dependence" stemming from "the critical import of water in the lives of the people." *Reppun v. Bd. of Water Supply*, 65 Haw. 531, 540, 656 P.2d 57, 64 (1982); *see generally id.* at 540-48, 656 P.2d at 64-68 (detailing the traditional systems of water and land management in Hawai'i and the emergence of western notions of property ownership); *see also Robinson v. Ariyoshi*, 65 Haw. 641, 676 n.33, 658 P.2d 287, 311 n.33 (1982) (describing the ancient Hawaiian system of water allocation). Even after the introduction of a more western system of private land ownership, Kingdom of Hawai'i laws continued to categorize water as a resource reserved for the public good. *See Reppun* 65 Haw. at 542-45, 656 P.2d at 65-67.

*McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 186, 504 P.2d 1330, 1338 (1973) (footnote omitted). As such, rights of water ownership were not included when private ownership of land was instituted in Hawai'i, but rather "the ownership of water in natural watercourses[,] streams and rivers remained in the people of Hawaii for their common good." *Id.* at 186-87, 504 P.2d at 1338-39. The State holds all such water in trust for the benefit of the common good. *Id.* at 187, 504 P.2d at 1339; *see also Robinson v. Ariyoshi*, 65 Haw. 641, 673-74, 658 P.2d 287, 310 (1982).

In 1978, amendments to the Hawai'i Constitution, including the promulgation of article XI, section 1, "elevated the public trust doctrine to the level of a constitutional mandate." *Waiāhole I*, 94 Hawai'i at 131, 9 P.3d at 443; *Kelly*, 111 Hawai'i at 222, 140 P.3d at 1002. "[T]he public trust doctrine applies to all water resources without exception or distinction." *Waiāhole I*, 94 Hawai'i at 133, 9 P.3d at 445; *see also Kelly*, 111 Hawai'i at 222, 140 P.3d at 1002.

Second, in determining whether the Planning Commission's *scope* of public trust duties required it to consider and protect water resources in this case, we are guided by *Kelly*. In *Kelly*, to determine whether the County of Hawai'i had a public trust duty to protect ocean waters involved in that case, the Hawai'i Supreme Court based its ruling on a combined analysis of article XI, section I and the "general laws" that delegated duties and responsibilities to the county. 111 Hawai'i at 224-25, 140 P.3d at 1004-05.

In *Kelly*, the Hawai'i Supreme Court held that the County of Hawai'i had public trust obligations to protect ocean waters that were affected by development activity on nearby land, where the activity had been regulated and permitted by the county. 111 Hawai'i at 224, 140 P.3d at 1004. There, a 1,540 acre residential, recreational, and agricultural development was

being constructed on the island of Hawai'i and, pursuant to the Hawai'i County Code, the developer was required to obtain grading and grubbing permits from the County of Hawai'i for construction activity and erosion control. *Id.* at 209-10, 140 P.3d at 989-90. As a result of two heavy storms, runoff from the property was alleged to have polluted the nearby pristine ocean waters, *id.* at 211-12, 140 P.3d at 991-92, and claims were subsequently asserted against, *inter alia*, the County of Hawai'i for violating its public trust duties.

In recognizing that the County of Hawaii's public trust obligations included protecting the ocean waters involved in that case, the *Kelly* court focused on the constitutional framework related to article XI, section 1 <u>and</u> the statutory authority conferring powers on the county. *Id.* at 224, 140 P.3d at 1004. The *Kelly* court first recognized that by its plain language, article XI, section 1 "provides that 'the State *and its political subdivisions* shall conserve and protect Hawaii's natural beauty and all natural resources[.]'" *Id.* (citation omitted). Importantly, the court then noted that, under a separate provision of the Hawai'i Constitution -- article VIII, section 1 -- "[t]he legislature shall create *counties*, and may create *other political subdivisions* within the State, and provide for the government thereof. <u>Each political subdivision shall have and exercise *such powers as shall be conferred under general laws*</u>." *Id.* (quoting Haw. Const. Art. VIII, sec. 1) (italics in original, underline emphasis added).

Given the constitutional mandates of article XI, section 1 *and* article VIII, section 1, the *Kelly* court then analyzed the statutory authority -- *i.e.*, the general laws -- under which the County of Hawai'i was acting in regulating the grading and grubbing activity in that case. The supreme court noted that:

> <u>The County's power **under general laws** with respect to its public trust duty to protect the natural water resources of</u>

> the State can be found in HRS chapter 180C (1993), entitled "Soil Erosion and Sediment Control." HRS § 180C-2(a) provides that "[t]he county governments, in cooperation with the soil and water conservation districts and other appropriate state and federal agencies, *shall* enact ordinances for the purpose of controlling soil erosion and sediment."

*Id.* at 224, 140 P.3d at 1004 (underline and bold emphasis added). The court then quoted from HRS § 180C-2(b) (2011 Repl.), which set out the minimum required of county ordinances for the purpose of soil erosion and sediment control. In particular, the supreme court highlighted a section of HRS § 180C-2(b) that required county ordinances to "[c]ontain standards for various types of soil and land uses, which standards shall include criteria, techniques, and methods for the control of erosion and sediment resulting from land disturbing activities." *Id.* (italics omitted, underline emphasis added). In turn, the supreme court noted that:

> "Land disturbing activity" is defined under HRS § 180C-1 (1993), in pertinent part as "any land change which may result in soil erosion from water or wind and the movement of sediment into state waters [.]" "State waters" are defined in pertinent part under the same statute as "all waters, fresh, brackish or salt, *around and within the State, including, but not limited to, coastal waters* [.]"

*Id.* at 225 n.23, 140 P.3d at 1005 n.23 (italics in original, underline emphasis added). Thus, the supreme court's analysis in *Kelly* demonstrates that the scope of the county's public trust duties in that case included the protection of the coastal water resources in light of both the public trust duties mandated by article XI, section 1 and the authority and duties delegated to the county by statute that established protection of the coastal waters as a concern for the county.

Indeed, the supreme court concluded this portion of its analysis as follows:

> the plain language of article XI, section 1 mandates that the County does have an obligation to conserve and protect the [S]tate's natural resources. Coupled with the State's power to create and delegate duties and responsibilities to the various counties through the enactment of statutes, the County's duty to conserve and protect is clear.

*Id.* at 224-25, 140 P.3d at 1004-05 (bold and underline emphasis added); *see also id.* at 227 n.29, 140 P.3d at 1007 n.29 (the legislative history for HRS Chapter 180C evidenced the legislature's intention "'to conserve and protect the land, water, and other resources of the State' by requiring 'the county governments to enact ordinances for the purpose of controlling soil erosion and sediment[.]'" (citing H. Stand. Comm. Rep. No. 234-74, in 1974 House Journal, at 647)).

Therefore, to determine whether the duties and responsibilities delegated to the County (and thus to the Planning Commission) encompass protection of the water at issue in this case, we must analyze the "general laws" authorizing the County (and thus the Planning Commission) to issue the three permits involved in this case.

(a)     **The Use Permit and Class IV Zoning Permit**

The Use Permit and Class IV Zoning Permit sought by Kauai Springs are regulated by the County pursuant to the County's delegated authority to zone. *See* HRS § 46-4 (Supp. 2006); KCC, Chapter 8, The Comprehensive Zoning Ordinance for the County of Kauai (CZO). The general law that conferred zoning powers to the counties is HRS § 46-4(a). *Kaiser Hawaii Kai Dev. Co. v. City and Cnty. of Honolulu*, 70 Haw. 480, 483, 777 P.2d 244, 246 (1989) ("The counties of our state derive their zoning powers from HRS § 46-4(a) . . . referred to as the Zoning Enabling Act."). HRS § 46-4(a) provides in relevant part:

> (a) . . . Zoning in all counties shall be accomplished within the framework of a long-range, comprehensive general plan prepared or being prepared to guide the overall future development of the county. Zoning shall be one of the tools available to the county to put the general plan into effect in an orderly manner. . . . The zoning power granted herein shall be exercised by ordinance which may relate to:
> (1) The areas within which agriculture, forestry, industry, trade, and business may be conducted;
> . . .
> (12) Other regulations the boards or city council find necessary and proper to permit and encourage the orderly development of land resources within their jurisdictions.

(Emphases added.)

Pursuant to HRS § 46-4(a), the County was thus authorized to adopt a comprehensive general plan to guide the county's future development and to adopt ordinances to exercise the zoning power. Kauai's General Plan recognizes that the zoning power granted under HRS § 46-4 must be based on a general plan and "[i]n fact, the general plan comes before and *guides* zoning." Kaua'i General Plan, 1.2.1; *see also* KCC, § 7-1.2 (Kauai's General Plan is "intended . . . to be considered in reviewing specific . . . development applications.").

Chapter 2 of Kauai's General Plan presents, *inter alia*, the vision for Kaua'i in the year 2020. The vision statement includes that "[t]he people of Kauai, along with the State and County governments, [will] practice <u>careful stewardship of the island's land and waters</u>. The <u>high mountains, forested watershed areas</u>, the ocean and coral reefs, beaches - <u>these areas are managed as part of the public lands trust</u>." Kaua'i General Plan at 2-3 (emphases added).[16]

Moreover, in the CZO adopted for the County, a Use Permit and a Class IV Zoning Permit[17] can be granted only if the Planning Commission finds, *inter alia*, that "the establishment, maintenance, or operation of the construction, development, activity or use in the particular case . . . <u>will not cause any substantial harmful environmental consequences on</u> the land of the applicant or on other lands or <u>waters, and will not be</u>

---

[16] Section 3.4 of the Kaua'i General Plan adopts policies related to watersheds, streams and water quality, however those policies apply "[i]n developing County roads and drainage facilities and in administering the grading, flood control, and drainage regulations[.]" Therefore, it does not appear that the policies adopted in Section 3.4 are pertinent to this case.

[17] A Class IV Zoning Permit is required because a Use Permit is required. *See* KCC § 8-7.7(4). There do not appear to be any independent standards in the KCC for approval of a Class IV Zoning Permit and the parties thus agree that the KCC standards for approving a Use Permit likewise apply to the Class IV Zoning Permit.

inconsistent with the intent of [the CZO] and the General Plan."
KCC § 8-20.5 (emphases added).

In sum, HRS § 46-4, *inter alia*, confers authority upon each county to zone, to adopt a comprehensive general plan to guide the overall future development of the county, and to exercise the zoning power by ordinance. Relevant to the County's public trust duty in this case, the Kaua'i General Plan and the zoning ordinance for issuing a Use Permit and a Class IV Zoning Permit provide for the protection of water and watershed areas. Therefore, as in *Kelly*, the County's public trust duty under article XI, section I of the Hawai'i Constitution, "[c]oupled with the State's power to create and delegate duties and responsibilities to the various counties through the enactment of statutes," 111 Hawai'i at 225, 140 P.3d at 1005 (emphasis added), establishes that the County (through the Planning Commission) had a duty to conserve and protect water in considering whether to issue the Use Permit and the Class IV Zoning Permit to Kauai Springs.

**(b)     The Special Permit**

A Special Permit was required in this case because the Property is located in a state agricultural district and operation of a spring water bottling facility is not otherwise permitted under HRS § 205-4.5 (Supp. 2006), which lists permissible uses within the state agricultural districts. HRS § 205-6 (Supp. 2012) delegates authority to the respective county planning commissions to promulgate procedures governing the issuance of Special Permits. HRS § 205-6 states in relevant part:

> § 205-6 Special Permit. (a) Subject to this section, the county planning commission may permit certain unusual and reasonable uses within agricultural and rural districts other than those for which the district is classified. Any person who desires to use the person's land within an agricultural or rural district other than for an agricultural or rural use, as the case may be, may petition the planning commission of the county within which the person's land is located for permission to use the person's land in the manner desired. . . .

. . .

> (c) The county planning commission may, under such protective restrictions as may be deemed necessary, permit the desired use, but <u>only when the use would promote the effectiveness and objectives of this chapter</u>; . . .

(Emphases added.)

The Hawai'i Supreme Court has ruled that the "overarching purpose" of HRS Chapter 205 is to "protect and conserve natural resources and foster intelligent, effective, and orderly land allocation and development." *Curtis v. Bd. of Appeals, Cnty. of Hawai'i*, 90 Hawai'i 384, 396, 978 P.2d 822, 834 (1999) (internal quotation marks omitted); *see also Cnty. of Hawai'i v. Ala Loop Homeowners*, 123 Hawai'i 391, 409, 235 P.3d 1103, 1121 (2010) ("HRS chapter 205 is a law relating to the conservation, protection and enhancement of natural resources[.]"). As noted in *Curtis*,

> The stated purpose of the law is, *inter alia*:
>
>> to protect and conserve through zoning the urban, agricultural and conservation lands within all the counties. A coordinated, balanced approach not only within each county but an overall balance of statewide land needs for economic growth is essential to:
>>
>> (1) Utilize the land resources in an intelligent, effective manner based upon the capabilities and characteristics of the soil and the needs of the economy;
>>
>> (2) <u>Conserve</u> forests, <u>water resources</u> and land, particularly to preserve the prime agricultural lands from unnecessary urbanization;
>>
>> (3) State the allocation of land for development in an orderly plan to meet actual needs and minimize costs of providing utilities and other public services . . . .

90 Hawai'i at 396, 978 P.2d at 834 (underline emphases added, italics and footnote omitted) (quoting H. Stand. Comm. Rep. No. 395, in 1961 House Journal, at 855-56).

HRS § 205-6 thus confers authority to the Planning Commission to grant special permits for uses not otherwise permitted in state agricultural districts, but only when the use

would promote the effectiveness and objectives of HRS Chapter 205. The overarching purpose of HRS Chapter 205 includes, among other things, the protection and conservation of water resources. Therefore, the Planning Commission's public trust duty under article XI, section 1 of the Hawai'i Constitution, <u>coupled with</u> the State's power to create and delegate duties to the counties, establishes that the Planning Commission had a duty to conserve and protect water resources in considering whether to issue the Special Permit to Kauai Springs.

(c)      <u>Kauai Springs' Current and Proposed Use of the Property Affects a Public Trust Resource</u>

Here, Kauai Springs' application seeks to continue operating a spring water bottling facility. The spring water utilized by Kauai Springs is held in trust for the common good and therefore the proposed use does have an impact on a public trust resource. *See Waiāhole I*, 94 Hawai'i at 133 n.31, 9 P.3d at 445 n.31 (rejecting the contention that the reference in Article XI, section 1 to "public natural resources" indicates an intent to exclude "privately owned" waters from the public trust inasmuch as "apart from any private rights that may exist in water, 'there is, as there always has been, a superior public interest in this natural bounty.'" (citations omitted)).

According to the record, Kauai Springs currently bottles between 1,500 and 2,500 gallons of water per week and proposes an increase to at least 35,000 gallons of water per week. Thus, the record clearly contains evidence that Kauai Springs' existing and proposed use of the Property directly affects a public trust resource. Accordingly, we vacate the circuit court's COL 63. We also vacate the circuit court's COLs 71 and 72 in that they fail to affirmatively recognize that the Planning Commission has a public trust duty to review Kauai Springs' use of water in its operations on the Property given

article XI, section 1, as well as the general laws and authorized regulatory provisions applicable to issuance of the Use Permit, Class IV Zoning Permit, and Special Permit.

We therefore agree with the Planning Commission that, in deciding whether to approve the application for the three permits, the Planning Commission's public trust duties required it to consider Kauai Springs' use of water for the existing and proposed operations of the water bottling facility on the Property. We thus reject Kauai Springs' assertion that the Planning Commission's public trust inquiry was limited only to whether public resources would be affected by Kauai Springs' *building* on agriculturally-zoned land.

## 2. Standards and Criteria for Reviewing the Application for Permits

Having determined that the Planning Commission's public trust duties required it to consider Kauai Springs' use of water in reviewing the application for the three permits, we now turn to the question of whether the Planning Commission employed the correct standards and criteria in carrying out its public trust obligations.

In this regard, the Planning Commission challenges the following COLs in the Circuit Court Order:

> 41. The Planning Commission did not consider the proper criteria when reviewing and processing Kauai Springs' zoning permit applications. The applicable standards for whether Use, Special, and Class IV permits should be issued are clearly established.
>
> . . .
>
> 59. The [Planning Commission Order] contains no finding, and there is no evidence in the Record, that Kauai Springs did not meet the criteria for issuing the three permits at issue in this appeal.
>
> . . .
>
> 73. If Kauai Springs bore the burden of proof that its proposed use did "not violate any applicable law administered by [the Water Commission], the PUC or any

other applicable regulatory agency," Kauai Springs plainly carried that burden of proof. Both of these agencies had provided their input to the Planning Commission, and neither agency had any substantial concerns with Kauai Springs, as reflected in the [Planning Commission Order].

. . .

75. . . . [The Planning Commission's] Conclusions of Law #3 and #4 are wrong.

As noted earlier, the Planning Commission's COLs 3 and 4, which the circuit court held were wrong, stated:

3. In view of the comments received from [the Water Commission] and PUC the land use permit process should insure that all applicable requirements and regulatory processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits. The Applicant, as a party to this proceeding should also carry the burden of proof that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency.

4. There is no substantive evidence that the Applicant has any legal standing and authority to extract and sell the water on a commercial basis.

(Emphases added.)

To determine whether the Planning Commission applied the correct standards and criteria in reviewing Kauai Springs' application for the permits, we again turn to *Kelly* for guidance. In *Kelly*, as noted above, the County of Hawai'i issued grading and grubbing permits for development of land near coastal waters. 111 Hawai'i at 210, 140 P.3d at 990. The Hawai'i Supreme Court rejected the County of Hawaii's argument that it had no duty, *inter alia*, to take affirmative action to make pre-permit assessments of the effect of the development on coastal resources. *Id.* at 226-28, 140 P.3d at 1006-08. Of note, in framing the county's duties and certain relevant standards in that case, the court relied, in part, on both the statute and the applicable provisions of the Hawai'i County Code setting out the

37

county's obligations to control soil erosion and sediment. *Id.* at 227-28, 140 P.3d at 1007-08.

Further, the *Kelly* court relied on certain standards in holding that the evidence in that case did not show that the county violated its public trust duties. *Id.* at 209, 228, 140 P.3d at 989, 1008. The court stated there was no evidence in the record "to show a lack of <u>reasonable erosion control measures</u> at the Property or that actions or inactions of the County caused any damage to coastal waters." *Id.* at 228, 140 P.3d at 1006 (emphasis added). The court also noted that "[i]t appears that no evidence was entered establishing a failure by the County to make <u>appropriate assessments</u> prior to the issuance of any approval or permit[.]" *Id.* (emphasis added). The court thus concluded that "inasmuch as the record is devoid of evidence adduced at trial that there was a lack of <u>reasonable erosion control measures</u> or that the County failed to make <u>appropriate assessments</u>," it could not sustain the trial court's ruling. *Id.* (Emphases added). Thus, the supreme court ruled that the trial court had erred in concluding that the county had breached its public trust duties. *Id.*

In addition to the guidance provided by *Kelly*, we recognize that, although the public trust doctrine and statutory protections of natural resources often overlap, the public trust doctrine "exists independently of any statutory protections supplied by the legislature." *Waiāhole I*, 94 Hawai'i at 132, 9 P.3d at 444. As the supreme court expressed, "[t]his view is all the more compelling . . . in light of our state's constitutional public trust mandate." *Id.* The supreme court endorsed the idea that "[m]ere compliance by [agencies] with their legislative authority is not sufficient to determine if their actions comport with the requirements of the public trust doctrine. The public trust doctrine at all times forms the outer boundaries of

permissible government action with respect to public trust
resources." *Id.* (quoting *Kootenai Envtl. Alliance v. Panhandle
Yacht Club, Inc.*, 105 Idaho 622, 671 P.2d 1085, 1095 (1983)).

We further recognize that under the public trust
doctrine, those seeking the private use of water for economic
gain have the burden to justify the use, given the public trust
considerations. As expressed in *In re Kukui (Molokai), Inc.*, 116
Hawai'i 481, 174 P.3d 320 (2007):

> Although "the state water resources trust acknowledges that
> private use for economic development may produce important
> public benefits and that such benefits must figure into any
> balancing of competing interests in water, it stops short of
> embracing private commercial use as a protected trust
> purpose." [*Waiāhole I*, 94 Hawai'i at 138, 9 P.3d at 450].
> Therefore, to the extent that "the public trust ...
> establishes use consistent with trust purposes as the norm
> or 'default' condition, ... it effectively prescribes a
> 'higher level of scrutiny' for private commercial uses." Id.
> at 142, 9 P.3d at 454 (footnote omitted). In this regard,
> "the burden ultimately lies with those seeking or approving
> such uses to justify them in light of the purposes protected
> by the trust." *Id.*

*Id.* at 508, 174 P.3d at 347; *see also Waiāhole I*, 94 Hawai'i at
138, 9 P.3d at 450 (noting that prior Hawai'i cases "generally
demonstrate that the public trust may allow grants of private
interests in trust resources under certain circumstances,"
however the case law did not "establish private commercial use as
among the public purposes *protected* by the trust."). Thus,
Hawai'i precedent does not suggest that use of water for economic
gain is illegal or improper *per se*. Indeed, as noted in *In re
Kukui (Molokai), Inc.* and *Waiāhole I*, private use of water for
economic gain could produce important public benefits. However,
such use is not protected as part of the public trust and a
higher level of scrutiny for such use is required.

Based on our reading of *Kelly*, *Waiāhole I*, and *In re
Kukui (Molokai), Inc.*, we thus hold that the applicable standards
and criteria that the Planning Commission is required to employ

to meet its public trust obligations in this case are as follows: that the Planning Commission's decision be initially grounded in the framework of the statutes and regulatory provisions that authorize the Planning Commission to act in this instance; in addition thereto, that the Planning Commission make appropriate assessments and require reasonable measures to protect the water resources at issue in this case; and, because Kauai Springs seeks to use the water for economic gain, this case requires that the Planning Commission give the permit application a higher level of scrutiny and, although Kauai Springs' use of the water is not illegal or improper per se, that Kauai Springs carries the burden to justify the use of the water in light of the purposes protected by the public trust.

As to the statutory and regulatory framework for the Use Permit and Class IV Zoning Permit, as noted above, HRS § 46-4(a) authorizes the County to adopt the Kauai General Plan and zoning ordinances. The general plan sets forth as part of its vision statement that "[t]he people of Kaua'i, along with the State and County governments, [will] practice careful stewardship of the island's land and waters." The Kauai CZO, more specifically, sets out the criteria for issuing the Use Permit and Class IV Zoning Permit,[18] as follows:

> (a) A Use Permit may be granted only if the Planning Commission finds that the establishment, maintenance, or operation of the construction, development, activity or use in the particular case is a compatible use and is not detrimental to health, safety, peace, morals, comfort and general welfare of persons residing or working in the neighborhood of the proposed use, or detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the community, and will not cause any substantial harmful environmental consequences on the land of the applicant or on other lands or waters, and

---

[18] As noted earlier, there does not appear to be independent standards for approval of a Class IV Zoning Permit. The parties agree that the KCC standards for approving a Use Permit also apply to the Class IV Zoning Permit.

> will not be inconsistent with the intent of this Chapter and the General Plan.
>
> (b) The Planning Commission may impose conditions on the permit involving any of the following matters: location, amount and type and time of construction, type of use, its maintenance and operation, type and amount of traffic, off-street parking, condition and width of adjoining roads, access, nuisance, values, appearance of the building, landscaping, yards, open areas and other matters deemed necessary by the Planning Commission.

KCC § 8-20.5 (emphasis added).

For the Special Permit, as noted above, HRS § 205-6(c) provides that "[t]he county planning commission may, under such protective restrictions as may be deemed necessary, permit the desired use, but only when the use would promote the effectiveness and objectives of this chapter[.]" The "overarching purpose" of HRS Chapter 205 is to "protect and conserve natural resources and foster intelligent, effective, and orderly land allocation and development." *Curtis* 90 Hawai'i at 396, 978 P.2d at 834 (internal quotation marks omitted). Further, and more specifically, the Planning Commission Rules 1-13-6 provide:

> 1-13-6 Guidelines for Issuance of Special Permit. The Planning Commission may approve a Special Permit under such protective restrictions as may be deemed necessary if it finds that the proposed use:
>
> (a) Is an unusual and reasonable use of land situated within the Agricultural or Rural District, whichever the case may be. The Planning Commission shall consider the following guidelines in determining unusual and reasonable use:
>
> > 1) Such use shall not be contrary to the objectives sought to be accomplished by Chapters 205 and 205A HRS, and the rules of the Land Use Commission;
> > 2) The desired use would not adversely affect surrounding property;
> > 3) The use would not unreasonably burden public agencies to provide roads and streets, sewers, water, drainage, school improvements, and police and fire protection;
> > 4) Unusual conditions, trends, and needs have arisen since the district boundaries and rules were established; and

41

> 5) The land upon which the proposed use is sought is unsuited for the uses permitted within the district; and
>
> (b) Would promote the effectiveness and objectives of Chapter 205, HRS, as amended.

(Emphasis added.)

Given the above, the Planning Commission's review of Kauai Springs' application should have been based, as an initial matter, upon the standards and criteria specified by its statutory and regulatory authority to issue the permits in question. Although the Planning Commission Order cites to, *inter alia*, KCC § 8-20.5 and Planning Commission Rules § 1-13-6 as setting out applicable standards for issuance of the permits, the denial of the permits is not based on any of the particular standards or criteria set out in those provisions.

The Planning Commission essentially required Kauai Springs to prove that its water usage -- and the sale of the water by the Knudson Trust and Grove Farm's operation of the water system -- were legal and met all potentially applicable regulatory requirements. No concerns are articulated in the Planning Commission Order related *per se* to Kauai Springs' water bottling operation or its particular use of the water. For instance, there is no concern articulated about the amount of water Kauai Springs sought to use, whether it was a compatible use in the area, whether it would be detrimental to the general welfare of other people or other property in the area or to the community, or whether it would cause harmful environmental consequences to lands or waters. There also was no concern articulated that Kauai Springs' use of water would be contrary to the objectives of HRS Chapter 205, HRS Chapter 205A or the rules of the Land Use Commission. Rather, the concerns stated in the Planning Commission Order are based on whether the Knudsen Trust and Grove Farm, who were non-parties to the proceeding, were in

compliance with all regulatory requirements, and whether Kauai Springs has "legal standing and authority to extract and sell the water on a commercial basis."

The Planning Commission Order references the Water Commission's remarks, stating:

> The Planning Department further acknowledges the qualifying remarks by [the Water Commission] that:
>
> • if the source needs to be modified in any way, a well modification permit from [the Water Commission] may be required;
>
> • if a pump is to be installed to induce additional water flow, a pump installation permit from [the Water Commission] would be required;
>
> • if the modification results in impacts to surface waters, a petition to amend the interim instream flow standard for affected surface waters must be made and approved prior to use of the water.

The Planning Commission Order then notes that the site visit to Tunnel No. 1 showed that certain items had been built in the tunnel.[19] In this regard, the Planning Commission Order states:

> In view of the foregoing, there may be outstanding regulatory processes with [the Water Commission] that the Applicant must satisfy. Based on the comments provided by [the Water Commission] and staff observations during the field trip, it should be the Applicant's responsibility to confirm and determine the need for any permits that may be required for the construction of the concrete stem wall and the steel panel mounted over the tunnel entrance.

The Planning Commission Order further highlights comments from the PUC that there was a possibility that Grove Farm may be operating a public utility and thus could be subject to PUC regulation. Further, the Planning Commission Order notes that the PUC's comments were informal and that to obtain a formal

---

[19] The Planning Commission Order notes that "to prevent infiltration of surface water into the tunnel, a concrete stem wall was constructed at the bottom of the tunnel entrance to above [the] water level within the tunnel and a steel panel was mounted over the tunnel entrance. Furthermore . . . inside the tunnel, water enters the system through a water pipe installed at or below the water surface."

opinion, the Planning Department could file a petition for declaratory relief.

As a result of the comments by the Water Commission and the PUC, COL 3 of the Planning Commission Order then concludes in relevant part that, "the land use permit process should insure that all applicable requirements and regulatory processes relating to water rights, usage, and sale are satisfactorily complied with prior to taking action on the subject permits," and that Kauai Springs as the applicant should carry the burden of proof "that the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency." (Emphasis added.)  Further, although there are no findings related to Kauai Springs' commercial use of the water, COL 4 of the Planning Commission Order concludes that "[t]here is no substantive evidence that the Applicant has any legal standing and authority to extract and sell the water on a commercial basis."

To its credit, the Planning Commission took seriously its public trust duty and made appropriate assessments by, *inter alia,* investigating the water source and the transmission of the water, seeking comment from a number of county and state agencies, and holding several hearings and seeking input from the community related to Kauai Springs' application for the permits. However, based on the articulated basis for its decision, the Planning Commission applied incorrect standards and criteria in denying the permits.

First, as an initial matter, there is no indication in the Planning Commission Order that denial of the permits was grounded upon any statutory or regulatory criteria relevant to the respective permits, or that those criteria were a part of the Planning Commission's consideration.  For instance, the Planning

44

Commission did not analyze or base its denial of the permits in any way on Kauai Springs' failure to meet any requirements under KCC § 8-20.5 (for the Use Permit or Class IV Zoning Permit) or Planning Commission Rules § 1-13-6 (for the Special Permit).

Second, under the circumstances of this case, it was not a reasonable measure for the Planning Commission to require that Kauai Springs prove that "the proposed use and sale of the water does not violate any applicable law administered by [the Water Commission], the PUC or any other applicable regulatory agency." This requirement creates an obscure and indefinite burden of proof because it is completely open-ended as to the "applicable law" that is of concern to the Planning Commission and completely open-ended as to "any other applicable regulatory agency" that the Planning Commission believes would have jurisdiction relevant to its permit review. Without making its requirements clear, the Planning Commission Order was arbitrary and capricious in denying the permits. *See* HRS § 91-14(g)(6) (2012 Repl.); *see also De Maria v. Enfield Planning and Zoning Comm'n*, 271 A.2d 105 (Conn.App.Ct. 1970) (holding that vague and undefined considerations alone were insufficient to support zoning authority's denial of construction permit); *Bethlehem Christian Fellowship, Inc. v. Planning and Zoning Comm'n of the Town of Morris*, 807 A.2d 1089 (Conn.App.Ct. 2002) (noting that a special permit could not be denied for vague or general reasons), *overruled on other grounds by Cambodian Buddhist Soc. of Connecticut, Inc. v. Planning and Zoning Comm'n of Town of Newtown*, 941 A.2d 868 (Conn.App.Ct. 2008).

Further, given the circumstances and the record in this case, it was not a reasonable measure for the Planning Commission to require Kauai Springs to undertake regulatory action to establish and confirm that other parties, Knudsen Trust and Grove Farm, were in compliance with "all applicable requirements and

regulatory processes," especially given the limited and specific concerns raised by the Water Commission and the PUC.  As noted above, the Planning Commission Order articulates a concern that involvement by the Water Commission would be needed if (a) the water source needed to be modified in any way, (b) a pump is to be installed to induce additional water flow, or (c) a modification results in impact to surface waters.[20]  These clearly are issues that could affect the water resource, but they are factual questions that could have been addressed directly by the Planning Commission.  As found by the circuit court and undisputed by the parties, the water system was constructed by Kōloa Sugar Mill in the 1890s to irrigate the ahupua'a of Kōloa, and thus the question is whether Kauai Springs' existing or proposed use of the water would require modification of the water source and/or would require that a pump be installed.  Because these questions can be answered by the Planning Commission, in light of the input from the Water Commission, it was not reasonable to require Kauai Springs to initiate an entirely separate regulatory proceeding before the Water Commission to determine that all applicable requirements were met.[21]  In the event that Kauai Springs failed to show that its water use would not require modification of the water source and would not

---

[20] In correspondence with the Planning Commission, the Water Commission clarified that no permits would be required from it if three conditions were met: (1) the tunnel is not being changed, and Kauai Springs' use of the water is not inducing more water to come out of the source or tunnel; (2) the existing source has been registered and is grandfathered, and there is an agreement between Kauai Springs and the operator of the system; and (3) there is a closed line from the tunnel to the tank.  The Planning Commission Order did not raise all of these conditions as a concern and thus we focus on the concerns raised in the order. Indeed, the record indicates that the water source had been registered with the Water Commission and that there was a closed water line from the tunnel to the Grove Farm tank.

[21] The parties do not address Kauai Springs' standing to initiate a proceeding before the Water Commission where the water source is on land owned by the Knudsen Trust, and therefore, we do not consider that question.

require a pump to be installed to induce more water to flow, then a denial of the permits on that basis would be appropriate under the public trust doctrine if modification of the water source or installation of a pump would jeopardize the water. However, the Planning Commission did not render its decision based on any such factual determinations.

With regard to the concern raised in the Planning Commission Order that Grove Farm may possibly be operating a public utility subject to PUC regulation, there is nothing in the order or the PUC's comments that suggests the water resources are in jeopardy or affected without PUC regulation of Grove Farm as a public utility. Based on the record, Grove Farm's water system has been in place for over a century and it currently supplies water to other users besides Kauai Springs, including at least eleven other homes in the area. Specifically as to Kauai Springs, the PUC commented that Kauai Springs' water bottling operation does not appear to be a public utility subject to PUC jurisdiction. Given this record, it was not reasonable to require Kauai Springs to initiate a proceeding with the PUC to determine if Grove Farm was a public utility subject to PUC jurisdiction.

Third, it is clear from the record that, because Kauai Springs seeks to use the water for economic gain, the Planning Commission did review the permit application with a heightened scrutiny. Moreover, the Planning Commission clearly placed a heavy burden on Kauai Springs. As articulated by the Planning Commission, however, the burden that it imposed was primarily focused on whether other parties were in compliance with all applicable laws. While compliance with the law by non-parties supplying water may in certain circumstances be a proper burden if such compliance will help to protect and conserve water, the concerns by the Water Commission in this case could be addressed

47

by the Planning Commission, and the PUC's comments did not suggest that water resources would be affected. Thus, the burden imposed here of requiring regulatory compliance by others with all applicable laws was not reasonable.

However, the Planning Commission can and should require Kauai Springs to carry the burden of justifying its use of water for economic gain in light of the purposes protected by the public trust. *In re Kukui (Molokai), Inc.*, 116 Hawai'i at 508, 174 P.3d at 347; *Waiāhole I*, 94 Hawai'i at 138, 142, 9 P.3d at 450, 454. In this regard, because Kauai Springs provides bottled water to residents and businesses on Kauai, such water usage "may produce important public benefits" and "such benefits must figure into any balancing of competing interests in water[.]" *Waiāhole I*, 94 Hawai'i at 138, 9 P.3d at 450. Ultimately, however, Kauai Springs must show that its use of the water for economic gain is justifiable given the public trust purposes.

Based on the above, the circuit court's COL 41 is correct to the extent that it concludes that the Planning Commission did not consider the proper criteria when reviewing and processing Kauai Springs' permit application. The circuit court's COL 75 is also correct to the extent it concludes that the Planning Commission's COL 3 was wrong.

The Planning Commission also challenged the circuit court's conclusion in COL 75 that the Planning Commission's COL 4 was wrong. As previously noted, the Planning Commission's COL 4 stated that "[t]here is no substantive evidence that the Applicant has any legal standing and authority to extract and sell the water on a commercial basis." We read COL 4 as raising a concern whether it was illegal or improper *per se* for Kauai Springs to use the water for economic gain. As discussed above, Hawai'i precedent does not hold that it is illegal or improper, in and of itself, to use water for economic gain. *Waiāhole I*, 94

Hawai'i at 138, 9 P.3d at 450; *In re Kukui (Molokai), Inc.*, 116 Hawai'i at 508, 174 P.3d at 347. The circuit court was therefore correct that the Planning Commission's COL 4 was wrong as a basis for denying the permits.

With regard to the remaining portion of the circuit court's COL 41, it is vacated to the extent that it suggests applicable standards inconsistent with this opinion. With respect to COLs 59 and 73, we address them below.

3. **Remand to the Planning Commission is Appropriate**

The Planning Commission challenges the circuit court's FOF 54 and COLs 73 and 74, arguing that the circuit court erred in determining that Kauai Springs had presented sufficient evidence that its proposed use of the water resources was legal. FOF 54 is clearly erroneous in that it misstates the Planning Commission Order and the information provided by the Water Commission, and thus it is vacated.[22] COLs 73 and 74 are based essentially on a determination that the Water Commission and the PUC had not raised substantial concerns about Kauai Springs' permit application. However, the framework of standards and criteria adopted above, applicable under the Planning Commission's public trust duties, are different than simply considering whether other agencies have raised substantial concerns. Therefore, COLs 73 and 74 are also vacated.

_____

[22] The circuit court's FOF 54 states in relevant part:

> 54. The [Planning Commission Order] stated the Water Commission informed the Planning Commission that Kauai Springs required "no permits" <u>because</u> "the Applicant's use of the water is not affecting the source in any way (i.e., not inducing more water to come out of the source or tunnel)," "the existing source has been registered and is basically grandfathered, and there is an agreement between the new user (Applicant) and the operator of the system," and "there is a closed line from the tunnel to the tank."

(Emphasis added). To the contrary, the Water Commission confirmed that no permits would be required from it <u>if</u> the stated conditions were met.

49

The Planning Commission further challenges the circuit court's COLs 43, 45 and 59, asserting that the circuit court erred in concluding that Kauai Springs met the requirements for the permits. The circuit court's conclusions, in this regard, appear to hold that Kauai Springs met the regulatory criteria in the CZO and the Planning Commission Rules for issuing the permits. The Planning Commission Order, however, does not address in any substantive way the requirements under the CZO and the Planning Commission Rules. As part of the more comprehensive framework of standards and criteria adopted above, we conclude that it would be more appropriate to allow the Planning Commission to consider and decide whether Kauai Springs can carry its burden in meeting the requirements of the CZO and the Planning Commission Rules. We therefore also vacate COLs 43, 45 and 59.

We remand this matter to the Planning Commission to consider Kauai Springs' application for the three permits consistent with the analysis set forth in this opinion. *See Public Access Shoreline Hawaii v. Hawai'i Cnty. Planning Comm'n*, 79 Hawai'i 425, 452, 903 P.2d 1246, 1273 (1995) (remanding permit application back to Hawai'i County Planning Commission for further proceedings consistent with the court's analysis).

To reiterate, article XI, section 1 of the Hawai'i Constitution and the general laws that authorize the Planning Commission to act on the Use Permit, the Class IV Zoning Permit, and the Special Permit require the Planning Commission to consider Kauai Springs' use of water under the public trust doctrine. The standards and criteria that apply are as follows: the Planning Commission's decision should be initially grounded in the framework of the statutes and regulatory provisions that authorize the Planning Commission to act in this instance; in addition, the Planning Commission should make <u>appropriate</u>

assessments and require reasonable measures to protect the water resources at issue in this case; and, because Kauai Springs seeks to use the water for economic gain, this case requires that the Planning Commission give the permit application a higher level of scrutiny and, although Kauai Springs' use of the water is not illegal or improper *per se*, Kauai Springs carries the burden to justify the use of the water in light of the purposes protected by the public trust.

## IV. CONCLUSION

Based on the foregoing, we vacate the circuit court's Final Judgment entered on September 23, 2008 and remand this case to the Planning Commission for further proceedings consistent with this opinion.

David J. Minkin
Dayna Kamimura-Ching
(Christopher D. Bayne with
  David J. Minkin on the briefs)
(McCorriston Miller Mukai and MacKinnon LLP)
(Alfred B. Castillo, Jr.,
  Office of the County Attorney with
  David J. Minkin on the briefs)
for Appellee-Appellant

Robert H. Thomas
(Mark M. Murakami with him
  on the briefs)
(Damon Key Leong Kupchak Hastert)
for Appellant-Appellee

Isaac H. Moriwake
(EarthJustice)
on the briefs for *Amici Curiae*
Mālama Kaua'i and Hawaii's Thousand Friends

Jon M. Van Dyke
Ernest M. Kimoto
(Office of Hawaiian Affairs)
on the briefs for *Amicus Curiae*
Office of Hawaiian Affairs